# WATCHTOWER BIBLE & TRACT SOCIETY OF NEW YORK, INC., ET AL. *v.* VILLAGE OF STRATTON ET AL.

No. 00–1737.   Argued February 26, 2002—Decided June 17, 2002

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. BREYER, J., filed a concurring opinion, in which SOUTER and GINSBURG, JJ., joined, *post*, p. 169. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 171. REHNQUIST, C. J., filed a dissenting opinion, *post*, p. 172.

*Paul D. Polidoro* argued the cause for petitioners. With him on the briefs were *Philip Brumley, Richard D. Moake,* and *Donald T. Ridley.*

*Abraham Cantor* argued the cause and filed a brief for respondents.

*David M. Gormley,* State Solicitor of Ohio, argued the cause for the State of Ohio et al. as *amici curiae* in support of respondents. With him on the brief were *Betty D. Montgomery,* Attorney General of Ohio, *Elise W. Porter* and *Kirk A. Lindsey,* Assistant Solicitors, and the Attorneys General for their respective States as follows: *Richard Blumenthal* of Connecticut, *Steve Carter* of Indiana, *Thomas J. Miller* of Iowa, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland, *Thomas Reilly* of Massachusetts, *Frankie Sue Del Papa* of Nevada, *W. A. Drew Edmondson* of Oklahoma, and *Hoke MacMillan* of Wyoming.*

---

*Briefs of *amici curiae* urging reversal were filed for Commonwealth of the Northern Mariana Islands by *Herbert D. Soll,* Attorney General,

JUSTICE STEVENS delivered the opinion of the Court.

Petitioners contend that a village ordinance making it a misdemeanor to engage in door-to-door advocacy without first registering with the mayor and receiving a permit violates the First Amendment. Through this facial challenge, we consider the door-to-door canvassing regulation not only as it applies to religious proselytizing, but also to anonymous political speech and the distribution of handbills.

I

Petitioner Watchtower Bible and Tract Society of New York, Inc., coordinates the preaching activities of Jehovah's Witnesses throughout the United States and publishes Bibles and religious periodicals that are widely distributed. Petitioner Wellsville, Ohio, Congregation of Jehovah's Witnesses, Inc., supervises the activities of approximately 59 members in a part of Ohio that includes the Village of Stratton (Village). Petitioners offer religious literature without cost to anyone interested in reading it. They allege that they do not solicit contributions or orders for the sale of merchandise or services, but they do accept donations.

Petitioners brought this action against the Village and its mayor in the United States District Court for the Southern

David Collins, and Karen M. Klaver; for the Center for Individual Freedom by Eric S. Jaffe; for the Church of Jesus Christ of Latter-day Saints by Von G. Keetch; for the Electronic Privacy Information Center et al. by Marc Rotenberg, Steven R. Shapiro, and Raymond Vasvari; and for RealCampaignReform.org, Inc., et al. by William J. Olson, John S. Miles, and Herbert W. Titus.

Briefs of amici curiae urging affirmance were filed for the Ohio Municipal League by Barry M. Byron and John E. Gotherman; and for the International Municipal Lawyers Association et al. by Richard Ruda and James I. Crowley.

Briefs of amici curiae were filed for the Brennan Center for Justice by Burt Neuborne, Deborah Goldberg, and Richard L. Hasen; and for Independent Baptist Churches of America by Thomas W. King III.

District of Ohio, seeking an injunction against the enforcement of several sections of Ordinance No. 1998–5 regulating uninvited peddling and solicitation on private property in the Village. Petitioners' complaint alleged that the ordinance violated several constitutional rights, including the free exercise of religion, free speech, and the freedom of the press. App. 10a–44a. The District Court conducted a bench trial at which evidence of the administration of the ordinance and its effect on petitioners was introduced.

Section 116.01 prohibits "canvassers" and others from "going in and upon" private residential property for the purpose of promoting any "cause" without first having obtained a permit pursuant to § 116.03.[1] That section provides that any canvasser who intends to go on private property to promote a cause must obtain a "Solicitation Permit" from the office of the mayor; there is no charge for the permit, and apparently one is issued routinely after an applicant

---

[1] Section 116.01 provides: "The practice of going in and upon private property and/or the private residences of Village residents in the Village by canvassers, solicitors, peddlers, hawkers, itinerant merchants or transient vendors of merchandise or services, not having been invited to do so by the owners or occupants of such private property or residences, and not having first obtained a permit pursuant to Section 116.03 of this Chapter, for the purpose of advertising, promoting, selling and/or explaining any product, service, organization or cause, or for the purpose of soliciting orders for the sale of goods, wares, merchandise or services, is hereby declared to be a nuisance and is prohibited." App. to Brief for Respondents 2a. The Village has interpreted the term "canvassers" to include Jehovah's Witnesses and the term "cause" to include their ministry. The ordinance does not appear to require a permit for a surveyor since such an individual would not be entering private property "for the purpose of advertising, promoting, selling and/or explaining any product, service, organization or cause, or for the purpose of soliciting orders for the sale of goods, wares, merchandise or services." Thus, contrary to the assumption of the dissent in its heavy reliance on the example from Dartmouth, post, at 172–173, 177, 179 (opinion of REHNQUIST, C. J.), the Village's ordinance would have done nothing to prevent that tragic crime.

fills out a fairly detailed "Solicitor's Registration Form."[2] The canvasser is then authorized to go upon premises that he listed on the registration form, but he must carry the permit upon his person and exhibit it whenever requested to do so by a police officer or by a resident.[3] The ordinance

[2] Section 116.03 provides:

"(a) No canvasser, solicitor, peddler, hawker, itinerant merchant or transient vendor of merchandise or services who is described in Section 116.01 of this Chapter and who intends to go in or upon private property or a private residence in the Village for any of the purposes described in Section 116.01, shall go in or upon such private property or residence without first registering in the office of the Mayor and obtaining a Solicitation Permit.

"(b) The registration required by subsection (a) hereof shall be made by filing a Solicitor's Registration Form, at the office of the Mayor, on a form furnished for such purpose. The Form shall be completed by the Registrant and it shall then contain the following information:

"(1) The name and home address of the Registrant and Registrant's residence for five years next preceding the date of registration;

"(2) A brief description of the nature and purpose of the business, promotion, solicitation, organization, cause, and/or the goods or services offered;

"(3) The name and address of the employer or affiliated organization, with credentials from the employer or organization showing the exact relationship and authority of the Applicant;

"(4) The length of time for which the privilege to canvass or solicit is desired;

"(5) The specific address of each private residence at which the Registrant intends to engage in the conduct described in Section 116.01 of this Chapter, and,

"(6) Such other information concerning the Registrant and its business or purpose as may be reasonably necessary to accurately describe the nature of the privilege desired." Brief for Respondents 3a–4a.

[3] Section 116.04 provides: "Each Registrant who complies with Section 116.03(b) shall be furnished a Solicitation Permit. The permit shall indicate that the applicant has registered as required by Section 116.03 of this Chapter. No permittee shall go in or upon any premises not listed on the Registrant's Solicitor's Registration Form.

"Each person shall at all times, while exercising the privilege in the Village incident to such permit, carry upon his person his permit and the

sets forth grounds for the denial or revocation of a permit,[4] but the record before us does not show that any application has been denied or that any permit has been revoked. Petitioners did not apply for a permit.

A section of the ordinance that petitioners do not challenge establishes a procedure by which a resident may prohibit solicitation even by holders of permits. If the resident files a "No Solicitation Registration Form" with the mayor, and also posts a "No Solicitation" sign on his property, no uninvited canvassers may enter his property, unless they are specifically authorized to do so in the "No Solicitation Registration Form" itself.[5] Only 32 of the Village's 278 residents

---

same shall be exhibited by such person whenever he is requested to do so by any police officer or by any person who is solicited." *Id.*, at 4a.

[4] Section 116.06 provides: "Permits described in Section 116.04 of this Chapter may be denied or revoked by the Mayor for any one or more of the following reasons:

"(a) Incomplete information provided by the Registrant in the Solicitor's Registration Form.

"(b) Fraud or misrepresentation contained in the Solicitor's Registration Form.

"(c) Fraud, misrepresentation or false statements made in the course of conducting the activity.

"(d) Violation of any of the provisions of this chapter or of other Codified Ordinances or of any State or Federal Law.

"(e) Conducting canvassing, soliciting or business in such a manner as to constitute a trespass upon private property.

"(f) The permittee ceases to possess the qualifications required in this chapter for the original registration." *Id.*, at 5a.

[5] Section 116.07 provides, in part: "(a) Notwithstanding the provisions of any other Section of this Chapter 116, any person, firm or corporation who is the owner or lawful occupant of private property within the territorial limits of the Village of Stratton, Ohio, may prohibit the practice of going in or upon the private property and/or the private residence of such owner or occupant, by uninvited canvassers, solicitors, peddlers, hawkers, itinerant merchants or transient vendors, by registering its property in accordance with Subdivision (b) of this Section and by posting upon each such registered property a sign which reads 'No Solicitation' in a location

filed such forms. Each of the forms in the record contains a list of 19 suggested exceptions;[6] on one form, a resident checked 17 exceptions, thereby excluding only "Jehovah's Witnesses" and "Political Candidates" from the list of invited canvassers. Although Jehovah's Witnesses do not consider themselves to be "solicitors" because they make no charge for their literature or their teaching, leaders of the church testified at trial that they would honor "no solicitation" signs in the Village. They also explained at trial that they did not apply for a permit because they derive their authority to

which is reasonably visible to persons who intend to enter upon such property.

"(b) The registration authorized by Subsection (a) hereof shall be made by filing a 'No Solicitation Registration Form', at the office of the Mayor, on a form furnished for such purpose. The form shall be completed by the property owner or occupant and it shall then contain the following information: . . . ." *Id.*, at 6a.

[6] The suggested exceptions listed on the form are:
1. Scouting Organizations
2. Camp Fire Girls
3. Children's Sports Organizations
4. Children's Solicitation for Supporting School Activities
5. Volunteer Fire Dept.
6. Jehovah's Witnesses
7. Political Candidates
8. Beauty Products Sales People
9. Watkins Sales
10. Christmas Carolers
11. Parcel Delivery
12. Little League
13. Trick or Treaters during Halloween Season
14. Police
15. Campaigners
16. Newspaper Carriers
17. Persons Affiliated with Stratton Church
18. Food Salesmen
19. Salespersons. App. 229a.

Apparently the ordinance would prohibit each of these 19 categories from canvassing unless expressly exempted.

preach from Scripture.[7] "For us to seek a permit from a municipality to preach we feel would almost be an insult to God." App. 321a.

Petitioners introduced some evidence that the ordinance was the product of the mayor's hostility to their ministry, but the District Court credited the mayor's testimony that it had been designed to protect the privacy rights of the Village residents, specifically to protect them "from 'flim flam' con artists who prey on small town populations." 61 F. Supp. 2d 734, 736 (SD Ohio 1999). Nevertheless, the court concluded that the terms of the ordinance applied to the activities of petitioners as well as to "business or political canvassers," id., at 737, 738.

The District Court upheld most provisions of the ordinance as valid, content-neutral regulations that did not infringe on petitioners' First Amendment rights. The court did, however, require the Village to accept narrowing constructions of three provisions. First, the court viewed the requirement in § 116.03(b)(5) that the applicant must list the specific address of each residence to be visited as potentially invalid, but cured by the Village's agreement to attach to the form a list of willing residents. Id., at 737. Second, it held that petitioners could comply with § 116.03(b)(6) by merely stating their purpose as "the Jehovah's Witness ministry." Id., at 738. And third, it held that § 116.05, which limited canvassing to the hours before 5 p.m., was invalid on its face and should be replaced with a provision referring to "reasonable hours of the day." Id., at 739. As so modified, the court held the ordinance constitutionally valid as applied to petitioners and dismissed the case.

----

[7] Specifically, from the Book of "Matthew chapter 28, verses 19 and 20, which we take as our commission to preach. . . . So Jesus, by example, instituted a house-to-house search for people so as to preach the good news to them. And that's the activity that Jehovah's Witnesses engage in, even as Christ's apostles did after his resurrection to heaven." Id., at 313a–314a.

The Court of Appeals for the Sixth Circuit affirmed. 240 F. 3d 553 (2001). It held that the ordinance was "content neutral and of general applicability and therefore subject to intermediate scrutiny." *Id.*, at 560. It rejected petitioners' reliance on the discussion of laws affecting both the free exercise of religion and free speech in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U. S. 872 (1990),[8] because that "language was dicta and therefore not binding." 240 F. 3d, at 561. It also rejected petitioners' argument that the ordinance is overbroad because it impairs the right to distribute pamphlets anonymously that we recognized in *McIntyre v. Ohio Elections Comm'n*, 514 U. S. 334 (1995), reasoning that "the very act of going door-to-door requires the canvassers to reveal a portion of their identities." 240 F. 3d, at 563. The Court of Appeals concluded that the interests promoted by the Village—"protecting its residents from fraud and undue annoyance"—as well as the harm that it seeks to prevent—"criminals posing as canvassers in order to defraud its residents"—though "by no means overwhelming," were sufficient to justify the regulation. *Id.*, at 565–566. The court distinguished earlier cases protecting the Jehovah's Witnesses ministry because those cases either in-

---

[8] "The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, see *Cantwell v. Connecticut*, 310 U. S., at 304–307 (invalidating a licensing system for religious and charitable solicitations under which the administrator had discretion to deny a license to any cause he deemed nonreligious); *Murdock v. Pennsylvania*, 319 U. S. 105 (1943) (invalidating a flat tax on solicitation as applied to the dissemination of religious ideas); *Follett v. McCormick*, 321 U. S. 573 (1944) (same), or the right of parents, acknowledged in *Pierce v. Society of Sisters*, 268 U. S. 510 (1925), to direct the education of their children, see *Wisconsin v. Yoder*, 406 U. S. 205 (1972) (invalidating compulsory school-attendance laws as applied to Amish parents who refused on religious grounds to send their children to school)." 494 U. S., at 881 (footnote omitted).

volved a flat prohibition on the dissemination of ideas, *e. g.*, *Martin* v. *City of Struthers*, 319 U. S. 141 (1943), or an ordinance that left the issuance of a permit to the discretion of a municipal officer, see, *e. g.*, *Cantwell* v. *Connecticut*, 310 U. S. 296, 302 (1940).

In dissent, Judge Gilman expressed the opinion that by subjecting noncommercial solicitation to the permit requirements, the ordinance significantly restricted a substantial quantity of speech unrelated to the Village's interest in eliminating fraud and unwanted annoyance. In his view, the Village "failed to demonstrate either the reality of the harm or the efficacy of the restriction." 240 F. 3d, at 572.

We granted certiorari to decide the following question: "Does a municipal ordinance that requires one to obtain a permit prior to engaging in the door-to-door advocacy of a political cause and to display upon demand the permit, which contains one's name, violate the First Amendment protection accorded to anonymous pamphleteering or discourse?" 534 U. S. 971 (2001); Pet. for Cert. i.[9]

## II

For over 50 years, the Court has invalidated restrictions on door-to-door canvassing and pamphleteering.[10] It is more than historical accident that most of these cases involved First Amendment challenges brought by Jehovah's Witnesses, because door-to-door canvassing is mandated by their religion. As we noted in *Murdock* v. *Pennsylvania*,

---

[9] In their briefs and at oral argument, the parties debated a factual issue embedded in the question presented, namely, whether the permit contains the speaker's name. We need not resolve this factual dispute in order to answer whether the ordinance's registration requirement abridges so much protected speech that it is invalid on its face.

[10] *Hynes* v. *Mayor and Council of Oradell*, 425 U. S. 610 (1976); *Martin* v. *City of Struthers*, 319 U. S. 141 (1943); *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943); *Jamison* v. *Texas*, 318 U. S. 413 (1943); *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940); *Schneider* v. *State (Town of Irvington)*, 308 U. S. 147 (1939); *Lovell* v. *City of Griffin*, 303 U. S. 444 (1938).

319 U. S. 105, 108 (1943), the Jehovah's Witnesses "claim to follow the example of Paul, teaching 'publickly, and from house to house.' Acts 20:20. They take literally the mandate of the Scriptures, 'Go ye into all the world, and preach the gospel to every creature.' Mark 16:15. In doing so they believe that they are obeying a commandment of God." Moreover, because they lack significant financial resources, the ability of the Witnesses to proselytize is seriously diminished by regulations that burden their efforts to canvass door-to-door.

Although our past cases involving Jehovah's Witnesses, most of which were decided shortly before and during World War II, do not directly control the question we confront today, they provide both a historical and analytical backdrop for consideration of petitioners' First Amendment claim that the breadth of the Village's ordinance offends the First Amendment.[11] Those cases involved petty offenses that raised constitutional questions of the most serious magnitude—questions that implicated the free exercise of religion, the freedom of speech, and the freedom of the press. From these decisions, several themes emerge that guide our consideration of the ordinance at issue here.

First, the cases emphasize the value of the speech involved. For example, in *Murdock v. Pennsylvania*, the Court noted that "hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses. It has been a potent force in various religious movements down through the years. . . . This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits. It has the same claim to protection as the more orthodox and conventional exercises of religion.

---

[11] The question presented is similar to one raised, but not decided, in *Hynes*. The ordinance that we held invalid in that case on vagueness grounds required advance notice to the police before "casually soliciting the votes of neighbors." 425 U. S., at 620, n. 4.

It also has the same claim as the others to the guarantees of freedom of speech and freedom of the press." *Id.*, at 108–109.

In addition, the cases discuss extensively the historical importance of door-to-door canvassing and pamphleteering as vehicles for the dissemination of ideas. In *Schneider* v. *State (Town of Irvington)*, 308 U. S. 147 (1939), the petitioner was a Jehovah's Witness who had been convicted of canvassing without a permit based on evidence that she had gone from house to house offering to leave books or booklets. Writing for the Court, Justice Roberts stated that "pamphlets have proved most effective instruments in the dissemination of opinion. And perhaps the most effective way of bringing them to the notice of individuals is their distribution at the homes of the people. On this method of communication the ordinance imposes censorship, abuse of which engendered the struggle in England which eventuated in the establishment of the doctrine of the freedom of the press embodied in our Constitution. To require a censorship through license which makes impossible the *free and unhampered* distribution of pamphlets strikes at the very heart of the constitutional guarantees." *Id.*, at 164 (emphasis added).

Despite the emphasis on the important role that door-to-door canvassing and pamphleteering has played in our constitutional tradition of free and open discussion, these early cases also recognized the interests a town may have in some form of regulation, particularly when the solicitation of money is involved. In *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940), the Court held that an ordinance requiring Jehovah's Witnesses to obtain a license before soliciting door to door was invalid because the issuance of the license depended on the exercise of discretion by a city official. Our opinion recognized that "a State may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds

for any purpose, to establish his identity and his authority to act for the cause which he purports to represent." *Id.*, at 306. Similarly, in *Martin* v. *City of Struthers*, the Court recognized crime prevention as a legitimate interest served by these ordinances and noted that "burglars frequently pose as canvassers, either in order that they may have a pretense to discover whether a house is empty and hence ripe for burglary, or for the purpose of spying out the premises in order that they may return later." 319 U. S., at 144. Despite recognition of these interests as legitimate, our precedent is clear that there must be a balance between these interests and the effect of the regulations on First Amendment rights. We "must 'be astute to examine the effect of the challenged legislation' and must 'weigh the circumstances and . . . appraise the substantiality of the reasons advanced in support of the regulation.'" *Ibid.* (quoting *Schneider*, 308 U. S., at 161).

Finally, the cases demonstrate that efforts of the Jehovah's Witnesses to resist speech regulation have not been a struggle for their rights alone. In *Martin*, after cataloging the many groups that rely extensively upon this method of communication, the Court summarized that "[d]oor to door distribution of circulars is essential to the poorly financed causes of little people." 319 U. S., at 144–146.

That the Jehovah's Witnesses are not the only "little people" who face the risk of silencing by regulations like the Village's is exemplified by our cases involving nonreligious speech. See, *e. g.*, *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620 (1980); *Hynes* v. *Mayor and Council of Oradell*, 425 U. S. 610 (1976); *Thomas* v. *Collins*, 323 U. S. 516 (1945). In *Thomas*, the issue was whether a labor leader could be required to obtain a permit before delivering a speech to prospective union members. After reviewing the Jehovah's Witnesses cases discussed above, the Court observed:

"As a matter of principle a requirement of registration in order to make a public speech would seem generally incompatible with an exercise of the rights of free speech and free assembly. . . .

.           .           .           .           .

"If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them and making such a condition the foundation for restraining in advance their exercise and for imposing a penalty for violating such a restraining order. So long as no more is involved than exercise of the rights of free speech and free assembly, it is immune to such a restriction. If one who solicits support for the cause of labor may be required to register as a condition to the exercise of his right to make a public speech, so may he who seeks to rally support for any social, business, religious or political cause. We think a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment." *Id.,* at 539–540.

Although these World War II-era cases provide guidance for our consideration of the question presented, they do not answer one preliminary issue that the parties adamantly dispute. That is, what standard of review ought we use in assessing the constitutionality of this ordinance. We find it unnecessary, however, to resolve that dispute because the breadth of speech affected by the ordinance and the nature of the regulation make it clear that the Court of Appeals erred in upholding it.

III

The Village argues that three interests are served by its ordinance: the prevention of fraud, the prevention of crime,

and the protection of residents' privacy. We have no difficulty concluding, in light of our precedent, that these are important interests that the Village may seek to safeguard through some form of regulation of solicitation activity. We must also look, however, to the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve.

The text of the Village's ordinance prohibits "canvassers" from going on private property for the purpose of explaining or promoting any "cause," unless they receive a permit and the residents visited have not opted for a "no solicitation" sign. Had this provision been construed to apply only to commercial activities and the solicitation of funds, arguably the ordinance would have been tailored to the Village's interest in protecting the privacy of its residents and preventing fraud. Yet, even though the Village has explained that the ordinance was adopted to serve those interests, it has never contended that it should be so narrowly interpreted. To the contrary, the Village's administration of its ordinance unquestionably demonstrates that the provisions apply to a significant number of noncommercial "canvassers" promoting a wide variety of "causes." Indeed, on the "No Solicitation Forms" provided to the residents, the canvassers include "Camp Fire Girls," "Jehovah's Witnesses," "Political Candidates," "Trick or Treaters during Halloween Season," and "Persons Affiliated with Stratton Church." The ordinance unquestionably applies, not only to religious causes, but to political activity as well. It would seem to extend to "residents casually soliciting the votes of neighbors,"[12] or ringing doorbells to enlist support for employing a more efficient garbage collector.

The mere fact that the ordinance covers so much speech raises constitutional concerns. It is offensive—not only to

---

[12] *Hynes*, 425 U. S., at 620, n. 4.

the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so. Even if the issuance of permits by the mayor's office is a ministerial task that is performed promptly and at no cost to the applicant, a law requiring a permit to engage in such speech constitutes a dramatic departure from our national heritage and constitutional tradition. Three obvious examples illustrate the pernicious effect of such a permit requirement.

First, as our cases involving distribution of unsigned handbills demonstrate,[13] there are a significant number of persons who support causes anonymously.[14] "The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S., at 341–342. The requirement that a canvasser must be identified in a permit application filed in the mayor's office and available for public inspection necessarily results in a surrender of that anonymity. Although it is true, as the Court of Appeals suggested, see 240 F. 3d, at 563, that persons who are known to the resident reveal their allegiance to a group or cause when they present themselves at the front door to advocate an issue or to deliver a handbill, the Court of Appeals erred in concluding that the ordinance does not implicate anonymity interests. The Sixth Circuit's reasoning is undermined by

---

[13] *Talley* v. *California*, 362 U. S. 60 (1960); *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334 (1995).

[14] Although the Jehovah's Witnesses do not themselves object to a loss of anonymity, they bring this facial challenge in part on the basis of overbreadth. We may, therefore, consider the impact of this ordinance on the free speech rights of individuals who are deterred from speaking because the registration provision would require them to forgo their right to speak anonymously. See *Broadrick* v. *Oklahoma*, 413 U. S. 601, 612 (1973).

our decision in *Buckley* v. *American Constitutional Law Foundation, Inc.*, 525 U. S. 182 (1999). The badge requirement that we invalidated in *Buckley* applied to petition circulators seeking signatures in face-to-face interactions. The fact that circulators revealed their physical identities did not foreclose our consideration of the circulators' interest in maintaining their anonymity. In the Village, strangers to the resident certainly maintain their anonymity, and the ordinance may preclude such persons from canvassing for unpopular causes. Such preclusion may well be justified in some situations—for example, by the special state interest in protecting the integrity of a ballot-initiative process, see *ibid.*, or by the interest in preventing fraudulent commercial transactions. The Village ordinance, however, sweeps more broadly, covering unpopular causes unrelated to commercial transactions or to any special interest in protecting the electoral process.

Second, requiring a permit as a prior condition on the exercise of the right to speak imposes an objective burden on some speech of citizens holding religious or patriotic views. As our World War II-era cases dramatically demonstrate, there are a significant number of persons whose religious scruples will prevent them from applying for such a license. There are no doubt other patriotic citizens, who have such firm convictions about their constitutional right to engage in uninhibited debate in the context of door-to-door advocacy, that they would prefer silence to speech licensed by a petty official.

Third, there is a significant amount of spontaneous speech that is effectively banned by the ordinance. A person who made a decision on a holiday or a weekend to take an active part in a political campaign could not begin to pass out handbills until after he or she obtained the required permit. Even a spontaneous decision to go across the street and urge a neighbor to vote against the mayor could not lawfully be implemented without first obtaining the mayor's permission.

In this respect, the regulation is analogous to the circulation licensing tax the Court invalidated in *Grosjean* v. *American Press Co.*, 297 U. S. 233 (1936). In *Grosjean*, while discussing the history of the Free Press Clause of the First Amendment, the Court stated that " '[t]he evils to be prevented were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens.'" *Id.*, at 249–250 (quoting 2 T. Cooley, Constitutional Limitations 886 (8th ed. 1927)); see also *Lovell* v. *City of Griffin*, 303 U. S. 444 (1938).

The breadth and unprecedented nature of this regulation does not alone render the ordinance invalid. Also central to our conclusion that the ordinance does not pass First Amendment scrutiny is that it is not tailored to the Village's stated interests. Even if the interest in preventing fraud could adequately support the ordinance insofar as it applies to commercial transactions and the solicitation of funds, that interest provides no support for its application to petitioners, to political campaigns, or to enlisting support for unpopular causes. The Village, however, argues that the ordinance is nonetheless valid because it serves the two additional interests of protecting the privacy of the resident and the prevention of crime.

With respect to the former, it seems clear that § 107 of the ordinance, which provides for the posting of "No Solicitation" signs and which is not challenged in this case, coupled with the resident's unquestioned right to refuse to engage in conversation with unwelcome visitors, provides ample protection for the unwilling listener. *Schaumburg*, 444 U. S., at 639 ("[T]he provision permitting homeowners to bar solicitors from their property by posting [no solicitation] signs . . . suggest[s] the availability of less intrusive and more effective measures to protect privacy"). The annoyance caused by an

uninvited knock on the front door is the same whether or not the visitor is armed with a permit.

With respect to the latter, it seems unlikely that the absence of a permit would preclude criminals from knocking on doors and engaging in conversations not covered by the ordinance. They might, for example, ask for directions or permission to use the telephone, or pose as surveyers or census takers. See n. 1, *supra.* Or they might register under a false name with impunity because the ordinance contains no provision for verifying an applicant's identity or organizational credentials. Moreover, the Village did not assert an interest in crime prevention below, and there is an absence of any evidence of a special crime problem related to door-to-door solicitation in the record before us.

The rhetoric used in the World War II-era opinions that repeatedly saved petitioners' coreligionists from petty prosecutions reflected the Court's evaluation of the First Amendment freedoms that are implicated in this case. The value judgment that then motivated a united democratic people fighting to defend those very freedoms from totalitarian attack is unchanged. It motivates our decision today.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, concurring.

While joining the Court's opinion, I write separately to note that the dissent's "crime prevention" justification for this ordinance is not a strong one. Cf. *post,* at 176–180 (opinion of REHNQUIST, C. J.). For one thing, there is no indication that the legislative body that passed the ordinance considered this justification. Stratton did not rely on the rationale in the courts below, see 61 F. Supp. 2d 734, 736 (SD Ohio 1999) (opinion of the District Court describing the

ordinance as "constructed to protect the Village residents from 'flim flam' con artists"); 240 F. 3d 553, 565 (CA6 2001) (opinion of the Court of Appeals describing interests as "protecting [the Village's] residents from fraud and undue annoyance"), and its general references to "deter[ing] crime" in its brief to this Court cannot fairly be construed to include anything other than the fraud it discusses specifically. Brief for Respondents 14–18.

In the intermediate scrutiny context, the Court ordinarily does not supply reasons the legislative body has not given. Cf. *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 816 (2000) ("When the Government restricts speech, *the Government bears the burden* of proving the constitutionality of its actions" (emphasis added)). That does not mean, as THE CHIEF JUSTICE suggests, that only a government with a "battery of constitutional lawyers," *post*, at 172, could satisfy this burden. It does mean that we expect a government to give its real reasons for passing an ordinance. Legislators, in even the smallest town, are perfectly able to do so—sometimes better on their own than with too many lawyers, *e. g.*, a "battery," trying to offer their advice. I can only conclude that if the village of Stratton thought preventing burglaries and violent crimes was an important justification for this ordinance, it would have said so.

But it is not just that. It is also intuitively implausible to think that Stratton's ordinance serves any governmental interest in preventing such crimes. As the Court notes, several categories of potential criminals will remain entirely untouched by the ordinance. *Ante*, at 168–169, 154, n. 1. And as to those who might be affected by it, "[w]e have never accepted mere conjecture as adequate to carry a First Amendment burden," *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 392 (2000). Even less readily should we accept such implausible conjecture offered not by the party itself but only by an *amicus*, see Brief for Ohio et al. as *Amici Curiae* 5–6.

Because Stratton did not rely on the crime prevention justification, because Stratton has not now "present[ed] more than anecdote and supposition," *Playboy Entertainment Group, supra,* at 822, and because the relationship between the interest and the ordinance is doubtful, I am unwilling to assume that these conjectured benefits outweigh the cost of abridging the speech covered by the ordinance.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

I concur in the judgment, for many but not all of the reasons set forth in the opinion for the Court. I do not agree, for example, that one of the causes of the invalidity of Stratton's ordinance is that some people have a religious objection to applying for a permit, and others (posited by the Court) "have such firm convictions about their constitutional right to engage in uninhibited debate in the context of door-to-door advocacy, that they would prefer silence to speech licensed by a petty official." *Ante,* at 167.

If a licensing requirement is otherwise lawful, it is in my view not invalidated by the fact that some people will choose, for religious reasons, to forgo speech rather than observe it. That would convert an invalid free-exercise claim, see *Employment Div., Dept. of Human Resources of Ore. v. Smith,* 494 U. S. 872 (1990), into a valid free-speech claim—and a more destructive one at that. Whereas the free-exercise claim, if acknowledged, would merely exempt Jehovah's Witnesses from the licensing requirement, the free-speech claim exempts *everybody,* thanks to Jehovah's Witnesses.

As for the Court's fairytale category of "patriotic citizens," *ante,* at 167, who would rather be silenced than licensed in a manner that the Constitution (but for their "patriotic" objection) would permit: If our free-speech jurisprudence is to be determined by the predicted behavior of such crackpots, we are in a sorry state indeed.

CHIEF JUSTICE REHNQUIST, dissenting.

Stratton is a village of 278 people located along the Ohio River where the borders of Ohio, West Virginia, and Pennsylvania converge. It is strung out along a multilane highway connecting it with the cities of East Liverpool to the north and Steubenville and Weirton, West Virginia, to the south. One may doubt how much legal help a village of this size has available in drafting an ordinance such as the present one, but even if it had availed itself of a battery of constitutional lawyers, they would have been of little use in the town's effort. For the Court today ignores the cases on which those lawyers would have relied, and comes up with newly fashioned doctrine. This doctrine contravenes well-established precedent, renders local governments largely impotent to address the very real safety threat that canvassers pose, and may actually result in less of the door-to-door communication that it seeks to protect.

More than half a century ago we recognized that canvassers, "whether selling pots or distributing leaflets, may lessen the peaceful enjoyment of a home," and that "burglars frequently pose as canvassers, either in order that they may have a pretense to discover whether a house is empty and hence ripe for burglary, or for the purpose of spying out the premises in order that they may return later." *Martin* v. *City of Struthers,* 319 U. S. 141, 144 (1943). These problems continue to be associated with door-to-door canvassing, as are even graver ones.

A recent double murder in Hanover, New Hampshire, a town of approximately 7,500 that would appear tranquil to most Americans but would probably seem like a bustling town of Dartmouth College students to Stratton residents, illustrates these dangers. Two teenagers murdered a married couple of Dartmouth College professors, Half and Susanne Zantop, in the Zantops' home. Investigators have concluded, based on the confession of one of the teenagers, that the teenagers went door-to-door intent on stealing

access numbers to bank debit cards and then killing their owners. See Dartmouth Professors Called Random Targets, Washington Post, Feb. 20, 2002, p. A2. Their *modus operandi* was to tell residents that they were conducting an environmental survey for school. They canvassed a few homes where no one answered. At another, the resident did not allow them in to conduct the "survey." They were allowed into the Zantop home. After conducting the phony environmental survey, they stabbed the Zantops to death. See *ibid.*

In order to reduce these very grave risks associated with canvassing, the 278 " 'little people,' " *ante,* at 163, of Stratton, who, unlike petitioners, do not have a team of attorneys at their ready disposal, see Jehovah's Witnesses May Make High Court History Again, Legal Times, Feb. 25, 2002, p. 1 (noting that petitioners have a team of 12 lawyers in their New York headquarters), enacted the ordinance at issue here. The residents did not prohibit door-to-door communication; they simply required that canvassers obtain a permit before going door-to-door. And the village does not have the discretion to reject an applicant who completes the application.

The town had little reason to suspect that the negligible burden of having to obtain a permit runs afoul of the First Amendment. For over 60 years, we have categorically stated that a permit requirement for door-to-door canvassers, which gives no discretion to the issuing authority, is constitutional. The District Court and Court of Appeals, relying on our cases, upheld the ordinance. The Court today, however, abruptly changes course and invalidates the ordinance.

The Court speaks of the "historical and analytical backdrop for consideration of petitioners' First Amendment claim," *ante,* at 161. But this "backdrop" is one of longstanding and unwavering approval of a permit requirement like Stratton's. Our early decisions in this area expressly

sanction a law that merely requires a canvasser to register. In *Cantwell* v. *Connecticut*, 310 U. S. 296, 306 (1940), we stated that "[w]ithout doubt a State may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent." In *Murdock* v. *Pennsylvania*, 319 U. S. 105, 116 (1943), we contrasted the license tax struck down in that case with "merely a registration ordinance calling for an identification of the solicitors so as to give the authorities some basis for investigating strangers coming into the community." And *Martin*, *supra*, at 148, states that a "city can punish those who call at a home in defiance of the previously expressed will of the occupant and, in addition, can by identification devices control the abuse of the privilege by criminals posing as canvassers."

It is telling that Justices Douglas and Black, perhaps the two Justices in this Court's history most identified with an expansive view of the First Amendment, authored, respectively, *Murdock* and *Martin*. Their belief in the constitutionality of the permit requirement that the Court strikes down today demonstrates just how far the Court's present jurisprudence has strayed from the core concerns of the First Amendment.

We reaffirmed our view that a discretionless permit requirement is constitutional in *Hynes* v. *Mayor and Council of Oradell*, 425 U. S. 610 (1976). *Hynes*, though striking down a registration ordinance on vagueness grounds, noted that "the Court has consistently recognized a municipality's power to protect its citizens from crime and undue annoyance by regulating soliciting and canvassing. A narrowly drawn ordinance, that does not vest in municipal officials the undefined power to determine what messages residents will hear, may serve these important interests without running afoul of the First Amendment." *Id.*, at 616–617.

The Stratton ordinance suffers from none of the defects deemed fatal in these earlier decisions. The ordinance does not prohibit door-to-door canvassing; it merely requires that canvassers fill out a form and receive a permit. Cf. *Martin, supra*. The mayor does not exercise any discretion in deciding who receives a permit; approval of the permit is automatic upon proper completion of the form. Cf. *Cantwell, supra*. And petitioners do not contend in this Court that the ordinance is vague. Cf. *Hynes, supra*.

Just as troubling as the Court's ignoring over 60 years of precedent is the difficulty of discerning from the Court's opinion what exactly it is about the Stratton ordinance that renders it unconstitutional. It is not clear what test the Court is applying, or under which part of that indeterminate test the ordinance fails. See *ante*, at 164 (finding it "unnecessary . . . to resolve" what standard of review applies to the ordinance). We are instead told that the "breadth of speech affected" and "the nature of the regulation" render the permit requirement unconstitutional. *Ibid.* Under a straightforward application of the applicable First Amendment framework, however, the ordinance easily passes muster.

There is no support in our case law for applying anything more stringent than intermediate scrutiny to the ordinance. The ordinance is content neutral and does not bar anyone from going door-to-door in Stratton. It merely regulates the manner in which one must canvass: A canvasser must first obtain a permit. It is, or perhaps I should say was, settled that the "government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989) (quoting *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984)). Earlier

this Term, the Court reaffirmed that this test applies to content-neutral time, place, or manner restrictions on speech in public forums. See *Thomas* v. *Chicago Park Dist.,* 534 U. S. 316 (2002).

The Court suggests that Stratton's regulation of speech warrants greater scrutiny. *Ante,* at 164. But it would be puzzling if regulations of speech taking place on *another citizen's* private property warranted greater scrutiny than regulations of speech taking place in public forums. Common sense and our precedent say just the opposite. In *Hynes,* the Court explained: "'Of all the methods of spreading unpopular ideas, [house-to-house canvassing] seems the least entitled to extensive protection. The possibilities of persuasion are slight compared with the certainties of annoyance. Great as is the value of exposing citizens to novel views, home is one place where a man ought to be able to shut himself up in his own ideas if he desires.'" 425 U. S., at 619 (quoting Z. Chafee, Free Speech in the United States 406 (1954)). In *Ward,* the Court held that intermediate scrutiny was appropriate *"even* in a public forum," 491 U. S., at 791 (emphasis added), appropriately recognizing that speech enjoys greater protection in a public forum that has been opened to all citizens, see *ibid.* Indeed, we have held that the mere proximity of private residential property to a public forum permits more extensive regulation of speech taking place at the public forum than would otherwise be allowed. See *Frisby* v. *Schultz,* 487 U. S. 474, 483–484 (1988). Surely then, intermediate scrutiny applies to a content-neutral regulation of speech that occurs not just near, but at, another citizen's private residence.

The Stratton regulation is aimed at three significant governmental interests: the prevention of fraud, the prevention of crime, and the protection of privacy.[1] The Court con-

---

[1] Of course, fraud itself may be a crime. I assume, as does the majority, that the interest in preventing "crime" refers to a separate interest in preventing burglaries and violent crimes.

cedes that "in light of our precedent, . . . these are important interests that [Stratton] may seek to safeguard through some form of regulation of solicitation activity." *Ante,* at 165. Although initially recognizing the important interest in preventing crime, the Court later indicates that the "absence of any evidence of a special crime problem related to door-to-door solicitation in the record before us" lessens this interest. *Ante,* at 169. But the village is entitled to rely on our assertion in *Martin* that door-to-door canvassing poses a risk of crime, see *Erie* v. *Pap's A. M.,* 529 U. S. 277, 297 (2000) (citing *Renton* v. *Playtime Theatres, Inc.,* 475 U. S. 41 (1986)), and the experience of other jurisdictions with crime stemming from door-to-door canvassing, see 529 U. S., at 297; *Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377, 393, n. 6 (2000).

The double murder in Hanover described above is but one tragic example of the crime threat posed by door-to-door canvassing. Other recent examples include a man soliciting gardening jobs door-to-door who tied up and robbed elderly residents, see Van Derbken, 98-Year-Old Latest Victim in Series of Home Invasions, San Francisco Chronicle, Sept. 13, 2000, p. A18, a door-to-door vacuum cleaner salesman who raped a woman, see Employers Liable for Rape by Salesman, Texas Lawyer, Jan. 11, 1999, p. 2, and a man going door-to-door purportedly on behalf of a church group who committed multiple sexual assaults, see Ingersoll, Sex Crime Suspect Traveled with Church Group, Wis. State Journal, Feb. 19, 2000, p. 1B. The Constitution does not require that Stratton first endure its own crime wave before it takes measures to prevent crime.

What is more, the Court soon forgets both the privacy and crime interests. It finds the ordinance too broad because it applies to a "significant number of noncommercial 'canvassers.'" *Ante,* at 165. But noncommercial canvassers, for example, those purporting to conduct environmental surveys for school, see *supra,* at 172–173, can violate no trespassing

signs and engage in burglaries and violent crimes just as easily as commercial canvassers can. See *Martin*, 319 U. S., at 144 (canvassers, "whether selling pots *or distributing leaflets*, may lessen the peaceful enjoyment of a home" and "sp[y] out" homes for burglaries (emphasis added)). Stratton's ordinance is thus narrowly tailored. It applies to everyone who poses the risks associated with door-to-door canvassing, *i. e.*, it applies to everyone who canvasses door-to-door. The Court takes what should be a virtue of the ordinance—that it is content neutral, cf. *44 Liquormart, Inc.* v. *Rhode Island*, 517 U. S. 484, 501 (1996) ("[O]ur commercial speech cases have recognized the dangers that attend governmental attempts to single out certain messages for suppression")—and turns it into a vice.

The next question is whether the ordinance serves the important interests of protecting privacy and preventing fraud and crime. With respect to the interest in protecting privacy, the Court concludes that "[t]he annoyance caused by an uninvited knock on the front door is the same whether or not the visitor is armed with a permit." *Ante*, at 168–169. True, but that misses the key point: The permit requirement results in fewer uninvited knocks. Those who have complied with the permit requirement are less likely to visit residences with no trespassing signs, as it is much easier for the authorities to track them down.

The Court also fails to grasp how the permit requirement serves Stratton's interest in preventing crime.[2] We have approved of permit requirements for those engaging in protected First Amendment activity because of a commonsense recognition that their existence both deters and helps detect wrongdoing. See, *e. g., Thomas* v. *Chicago Park Dist.*, 534

---

[2] It is sufficient that the ordinance serves the important interest of protecting residents' privacy. A law need only serve *a* governmental interest. Because the Court's treatment of Stratton's interest in preventing crime gives short shrift to Stratton's attempt to deal with a very serious problem, I address that issue as well.

U. S. 316 (2002) (upholding a permit requirement aimed, in part, at preventing unlawful uses of a park and assuring financial accountability for damage caused by the event). And while some people, intent on committing burglaries or violent crimes, are not likely to be deterred by the prospect of a misdemeanor for violating the permit ordinance, the ordinance's effectiveness does not depend on criminals registering.

The ordinance prevents and detects serious crime by making it a crime not to register. Take the Hanover double murder discussed earlier. The murderers did not achieve their objective until they visited their fifth home over a period of seven months. If Hanover had a permit requirement, the teens may have been stopped before they achieved their objective. One of the residents they visited may have informed the police that there were two canvassers who lacked a permit. Such neighborly vigilance, though perhaps foreign to those residing in modern day cities, is not uncommon in small towns. Or the police on their own may have discovered that two canvassers were violating the ordinance. Apprehension for violating the permit requirement may well have frustrated the teenagers' objectives; it certainly would have assisted in solving the murders had the teenagers gone ahead with their plan.[3]

Of course, the Stratton ordinance does not guarantee that no canvasser will ever commit a burglary or violent crime. The Court seems to think this dooms the ordinance, erecting an insurmountable hurdle that a law must provide a foolproof method of preventing crime. In order to survive intermediate scrutiny, however, a law need not solve the crime

---

[3] Indeed, an increased focus on apprehending criminals for "petty" offenses, such as not paying subway fares, is credited with the dramatic reduction in violent crimes in New York City during the last decade. See, e. g., M. Gladwell, The Tipping Point: How Little Things Can Make a Big Difference (2000). If this works in New York City, surely it can work in a small village like Stratton.

problem, it need only further the interest in preventing crime. Some deterrence of serious criminal activity is more than enough to survive intermediate scrutiny.

The final requirement of intermediate scrutiny is that a regulation leave open ample alternatives for expression. Undoubtedly, ample alternatives exist here. Most obviously, canvassers are free to go door-to-door after filling out the permit application. And those without permits may communicate on public sidewalks, on street corners, through the mail, or through the telephone.

Intermediate scrutiny analysis thus confirms what our cases have long said: A discretionless permit requirement for canvassers does not violate the First Amendment. Today, the Court elevates its concern with what is, at most, a negligible burden on door-to-door communication above this established proposition. Ironically, however, today's decision may result in less of the door-to-door communication that the Court extols. As the Court recognizes, any homeowner may place a "No Solicitation" sign on his or her property, and it is a crime to violate that sign. *Ante*, at 168. In light of today's decision depriving Stratton residents of the degree of accountability and safety that the permit requirement provides, more and more residents may decide to place these signs in their yards and cut off door-to-door communication altogether.