**OHIO CITIZEN ACTION, Plaintiff,**

v.

**CITY OF MENTOR–ON–THE–LAKE, Defendant.**

**No. 1:02 CV 866.**

United States District Court,
N.D. Ohio,
Eastern Division.

May 20, 2003.

James M. Lyons, Lyons & O'Donnell, Painesville, OH, Jim Lyons, City of Mentor on the Lake, Mentor on the Lake, OH, Hilary S Taylor, Gary A. Vick, Jr., Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, for Mentor on the Lake, City of, Defendant.

## MEMORANDUM OPINION AND ORDER

NUGENT, District Judge.

This action comes before the Court on Plaintiff, Ohio Citizens Action's ("OCA") request for preliminary and permanent injunctive relief, declaratory relief, and damages against the City of Mentor–On–The–Lake ("Mentor–On–The–Lake" or "the City"). Plaintiff alleges that Mentor–On–The–Lake's ordinance regulating canvassing and solicitation—Chapter 850—("the Ordinance") violates the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. OCA has challenged the Ordinance's licensing requirements and curfew provision as being both facially unconstitutional, and unconstitutional "as applied." OCA believes that it is entitled to compensatory damages, constitutional damages and attorneys fees. Mentor–On–The–Lake agrees that certain of its licensing regulations have been deemed unconstitutional by the recent United States Supreme Court case *Watchtower v. Stratton*, 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002). However, it argues that *Stratton* does not apply to the licensing requirements imposed on entities that solicit donations, including OCA. Further, because, since the *Stratton* decision, Mentor–On–The–Lake has voluntarily stopped enforcing the licensing requirements against canvassers who do not solicit donations, the City argues that it should not be liable for any constitutional damages or attorneys fees.

Todd W. Bartimole, Edward A. Icove, Smith & Condeni, Cleveland, OH, for Ohio Citizen Action, Plaintiff.

This Court finds that the Ordinance at issue is unconstitutional on its face, and that it has been applied to prevent OCA from conducting lawful speech and fundraising. Therefore, Plaintiffs Motion for Judgment on the Pleadings and/or Partial Summary Judgment is GRANTED. There remains an issue of fact as to the amount and types of damages that are warranted.

### BACKGROUND

The City of Mentor–On–The–Lake is an Ohio Municipal Corporation. It has adopted a licensing ordinance regulating canvassers, solicitors, and those who sell goods and wares door-to-door. Violation of the Ordinance subjects a canvasser/solicitor to criminal penalties. The Ordinance distinguishes between canvassers and solicitors but provides no definition for either term. The following provisions of Chapter 850 of Mentor–On–The–Lake's canvassing/solicitation ordinance are at issue:

*850.01 LICENSE REQUIRED*

No person shall engage in the activity of canvassing and/or soliciting and/or selling or offering for sale, barter or exchange, or go from door to door soliciting the purchase of, or gift of, any goods, wares, merchandise or other articles of value, including food, candy, confections, frozen desserts and beverages or money, or offering any services for hire or commission in any places within the City, without first having obtained a license therefore from the Mayor or other duly authorized issuing authority, which license such person shall at all times have with him or her while exercising such calling, and he or she shall exhibit such license to any police officer or City official upon demand or upon the demand of any person to whom he or she is peddling, soliciting, or canvassing.

*850.02 LICENSE APPLICATION: FEE*

(a) Applications for the license required by Section 850.01 shall be made to the Mayor or other duly authorized issuing authority. In addition to the requirements of Section 804.03, such application shall clearly set forth the place where and the duration of time the applicant was last engaged in business and the nature and character of such business, and such references as to the good moral character and integrity of the applicant as the Mayor or other duly authorized issuing authority may require. Before the issuance of the license, the Mayor or other duly authorized issuing authority shall require that the applicant and all persons conducting solicitations complete a BCI civilian identification fingerprint card that shall be filled out completely by the applicant, and such card shall then be signed by the applicant and the official taking the fingerprints. The reason for the fingerprinting shall be stated by the official taking the fingerprints on the BCI civilian identification fingerprint card.

The applicant shall then submit the fingerprint card to the Ohio Bureau of Criminal Identification, along with a cashier's check to cover the fee required by the Ohio Bureau of Criminal Identification. The applicant shall then instruct the Ohio Bureau of Criminal Identification to return the criminal record check to the Police Department and this record check must be received by the Police Department before the issuance of the permit. The Mayor or other duly authorized issuing authority may also require that such applicant be photographed for the records of the Police Department. These requirements are for the purpose of determining the reputation and record, if any, of the applicant.

(b) The fee for such license shall be one hundred dollars ($100.00) per year

per peddler or solicitor. (Ord. 96–O–03. Passed 3–12–96)

*850.03 EXEMPTIONS*

(a) The following persons are hereby declared exempt from the payment of any license fee for the license required by Section 850.01 and from completing any BCI civilian identification fingerprint cards:

(1) Any person selling a product of his or her own raising;

(2) A manufacturer selling any article manufactured by him or her;

(3) Commercial travelers or selling agents calling upon commercial establishments in the usual course of business;

(4) Duly authorized solicitors on behalf of any educational, charitable, civic, religious or other non-profit organization, as defined in Ohio R.C. 2915.01(H) through (P); and

(5) All other persons exempted by law.

(b) No person referred to in paragraphs (a)(1),(2), (4) and (5) hereof shall engage in the operation of selling or soliciting, as set forth in Section 850.01, without first obtaining a permit therefor from the Mayor or other duly authorized issuing authority, which permit shall be issued without fee and shall be valid for a specified time only, not beyond December 31 following the date of issuance.

(c) The provisions of this chapter shall not apply to the sale and delivery on a regular route or schedule of newspapers, dairy products, baked goods, laundry, diaper service and dry cleaning service. (Ord. 96–O–03. Passed 3–12–96)

*850.04 PERMITTED HOURS: PROHIBITIONS*

(a) No person shall canvass, sell or offer for sale, barter or exchange, or engage in door-to-door solicitation of the purchase or gift of, any goods, wares, merchandise or other articles of value, except those persons soliciting funds or gifts for any recognized educational, charitable, civic or religious organization and those persons offering for sale food, candy, confections, frozen desserts and beverages, within the City during the period from 5:00 p.m. to 9:00 a.m. of the following day. Those persons soliciting funds or gifts for any recognized charitable, educational, civic or religious organization may solicit during the period from 9:00 a.m. to 8:00 p.m. or one-half hour after sunset, whichever comes first. Those persons offering for sale food, candy, confections, frozen desserts or beverages within the City may solicit during the period from 9:00 a.m. to one-half hour after sunset.

Ohio Citizen Action is a non-profit public interest group, exempt from federal income tax as a social welfare organization and properly registered with the State of Ohio as a "charitable organization". (Buchanan Aff. ¶ 2). OCA goes door-to-door disseminating information, petitioning and fund-raising for political proposals and policies (particularly consumer and environmental issues). OCA maintains that it has successfully canvassed in Mentor–On–The–Lake for fifteen years, with the City's knowledge, ending in 1998. During these years OCA canvassed until 9:00 p.m., without obtaining a license, paying a fee, or providing fingerprints or background checks. (Buchanan Aff. ¶ 6). Further, its canvassers have allegedly been generally well received until 9:00 pm. (Buchanan Aff. ¶ 8).

In 2000, with no change to the Ordinance, Mentor–On–The–Lake informed OCA that it would begin enforcing the earlier curfew, would require OCA to obtain a license at a cost of $100, and would require OCA to provide and pay for BCI

fingerprinting for each of its canvassers. OCA requested that Mentor–On–The–Lake recognize it as exempt from these requirements pursuant to Section 850.03, however, the City refused to change its position. Rather than submit to the curfew, registration and identification requirements, OCA suspended its door-to-door campaign. (Buchanan Aff. ¶ 10; Jackson Aff. ¶ 3–9). OCA contends that if its canvassing is subject to the 8:00 p.m. or one half hour after sunset curfew in the Ordinance that it will not be effective because too few citizens are home before the curfew goes into effect. (Buchanan Aff. ¶ 7). OCA has tested alternatives to door-to-door canvassing and has not found any that were effective enough to "pay their own way." (Buchanan Aff. ¶ 4).

In June of 2002, the United States Supreme Court decided the case of *Watchtower v. Stratton,* 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002). In *Stratton,* the Supreme Court held that an ordinance that makes it a misdemeanor to engage in door-to-door advocacy, religious proselytizing, anonymous political speech, and distribution of handbills without first registering with the mayor and receiving a permit violates the First Amendment. Mentor–On–The–Lake has accepted this holding and asserts that it no longer enforces the licensing requirement for mere canvassing.

■ The fact that the City is not currently enforcing the provisions that Stratton found to be unconstitutional does not moot the issue. "Voluntary cessation of challenged conduct moots a case … only if it is 'absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur.'" *Adarand Constructors, Inc. v. Slater,* 528 U.S. 216, 222, 120 S.Ct. 722, 145 L.Ed.2d 650 (quoting *United States v. Concentrated Phosphate Export Assn., Inc.,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)). There is a heavy burden on the party asserting mootness to persuade the court that the challenged conduct cannot reasonably be expected to start up again. *Id.* In this case while the City has pointed out that it is not enforcing the licensing provisions against entities who do not solicit money or sales, they have not made any showing that would satisfy the heavy burden imposed on them to prove that the wrongful behavior could not be expected to recur at some point, nor have they altered the Ordinance to comply with the dictates of *Stratton.* Further, as "canvassing" and "solicitation" remain undefined in the Ordinance it is impossible to determine precisely who the City is requiring to be licensed, and who it believes to be exempt under *Stratton.*

The City argues that Stratton does not prohibit the licensing of solicitors and peddlers, and that the curfew imposed by the Ordinance is a valid regulation necessary to protect the residents of the City from the dangers of darkness and undue annoyance. OCA argues that when monetary solicitation is secondary to political canvassing, the canvassers should enjoy the full protection of *Stratton* despite the fact that they are also soliciting funds. OCA further argues that the curfew is unconstitutional in substance and void for vagueness.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, an-

swers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.,* 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995) (citing *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-mover. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.,* 53 F.3d 146, 149 (6th Cir.1995). Fed.R.Civ.P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

### ANALYSIS

Courts have applied a multitude of different tests to First Amendment restraints. The level of scrutiny applied depends primarily on the type of restriction at issue. When a regulation prohibits or substantially burdens [1] a particular type of

---

**1.** "The distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scruti-

ny as its content-based bans." *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000).

speech based upon its message it is "content based," and strict scrutiny applies. Strict scrutiny demands that a regulation must address a compelling governmental interest and there must be no other less restrictive means of preserving that interest.

Regulations which have the effect of prohibiting or substantially burdening speech, but which would apply equally to any form of speech regardless of its message face an intermediate level of scrutiny. Intermediate scrutiny requires that a regulation be narrowly tailored to serve a significant governmental interest. Regulations which limit the time, place, and manner of speech, and which are not content based, are analyzed under intermediate scrutiny but with an additional requirement that they leave open ample alternative channels for communication of information. *Forsyth County v. The Nationalist Movement*, 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

Within each level of scrutiny, courts are required to balance a variety of factors relating to the type of speech at issue and the governmental interests at stake. Included among these considerations are the amount of speech covered by the regulation, the degree of anonymity that would be sacrificed, the degree of spontaneity that would be lost, the importance of the governmental interests at stake, the effectiveness of the regulation in addressing the governmental interests, the scope of the regulation, and the degree of discretion afforded to municipal officers in enforcing the regulation.

When a regulation imposes a prior restraint on protected speech, it must satisfy the appropriate level of scrutiny, and provide narrow, objective and definite standards for the enforcement of the regula-

tion. In addition, regulations imposing a prior restraint must provide for prompt judicial review of all decisions denying the right to speak. *See Shuttlesworth v. Birmingham*, 394 U.S. 147, 150–151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Freedman v. State of Maryland*, 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

A. *Licensing Requirements*

1. As Applied

Social, political and religious door-to-door canvassing which does not involve the solicitation of money or the sale of goods, has historically been among the most protected activities under the First Amendment. This method of communication is so important and is afforded so much weight under the balancing of interests that the United States Supreme Court has recently held that it may not be subjected to a prior restraint through a licensing or registration requirement, regardless of the level of scrutiny. The Court further noted that any such requirement would inhibit the free exercise of an individual's right to express ideas and solicit support for those ideas anonymously and spontaneously. *Watchtower v. Stratton*, 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002).

The parties agree that *Stratton* invalidates any ordinance provisions purporting to require an entity to register with the Sheriff or obtain a license prior to canvassing a neighborhood for the purpose of advocacy, or engaging in political or religious speech. The City's declaration that it is not enforcing this portion of the Ordinance while laudable is not curative. Therefore, to the extent that Sections 850.01 and 850.02 prohibit persons from going door to door to communicate their social, political, or religious ideas and positions without first having obtained a license, it is facially invalid.

■ The *Stratton* court based its opinion in large part on the First Amendment right to anonymous speech, therefore, the identification requirements attendant to the licensing provision are also clearly invalid. This would include the requirements for fingerprinting and background checks, and the licensing authority's purported right to photograph applicants, as well as all fees associated with these requirements. However, because OCA's canvassing activities include the solicitation of monetary donations, this case is distinguishable from *Stratton*, and our inquiry can not end here.

Mentor–On–The–Lake argues that *Stratton* does not apply to the licensing requirements enforced against OCA because OCA solicits donations during its canvassing campaigns. A non-discriminatory regulation of solicitation does not violate Constitutional protections if it does not unreasonably obstruct or delay the collection of funds, even if it affects solicitations connected with political or religious speech. C.f. *Cantwell v. Connecticut,* 310 U.S. 296, 305, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). This does not mean, however, that such regulation may take the form of a licensing requirement or other prior restraint.

■ The U.S. Supreme Court has long held that financial appeals by a charitable organization are inextricably intertwined with fully protected speech that the organization espouses. Charitable appeals for donations, "on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes." *Sec. of State of Maryland v. Joseph H. Munson Co., Inc.,* 467 U.S. 947, 959, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). Communications must be viewed as a whole when determining what level of scrutiny to apply to a limiting regulation. *Riley v. National Federation for the Blind,* 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988).

■ A city's regulation of solicitation "must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely also cease." *Munson,* 467 U.S. at 960, 104 S.Ct. 2839. When a charitable or other non-profit organization incorporates a request for donations or other fund-raising activities with their otherwise fully protected speech, the courts may not parcel out the financial or "commercial" aspect of the speech in order to justify the application of a lower level of scrutiny. *See, e.g., Riley* 487 U.S. at 796, 108 S.Ct. 2667.

■ When charitable appeals for donations are included in canvassing campaigns whose primary purpose is the communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes, they may not be regulated in a stricter manner than the underlying communications. Thus, the prohibition against requiring the licensing of charitable organizations who wish to go door-to-door in an informational or advocacy campaign, as set forth in *Stratton,* must apply equally to charitable organizations who incorporate the solicitation of funds for their cause during such campaigns, and to those who do not.

■ OCA maintains that it is a non-profit charitable organization and that it is recognized as such by the state of Ohio. While Mentor–On–The–Lake does not dispute this, it has maintained that OCA is not a charitable organization as defined by

its Ordinance. The Ordinance defines a charitable, civic, religious or other non-profit organization as it is defined in Ohio Revised Code 2915.01(H) through (P). O.R.C. 2915.01 defines those charitable and other non-profit organizations that are conditionally exempt from the criminal prohibition against gambling. OCA does not dispute that it's organization does not fit this particular definition.

For purposes of this issue, the definition set forth in the Ordinance is irrelevant. OCA is a state recognized charitable non-profit which, under Stratton, is exempt from licensing or registration restrictions on its speech even though it is not necessarily exempt from Ohio's laws against organized gambling. Mentor–On–The–Lake has not disputed that OCA's solicitations are limited to fund-raising for the cause(s) which is the subject of their otherwise fully protected speech. Therefore, the Court finds that the licensing provisions in the Ordinance, including the licensing requirement, the fingerprinting and background check, and all associated fees (§§ 850.01 and 850.02) are unconstitutional prior restraints as applied to OCA.

Although this finding may resolve the licensing issue for the Plaintiff and other charitable and/or religious and political non-profit organizations, the complaint in this case raises a facial as well as an "as applied" challenge to the Ordinance. Therefore, we must continue our examination of the ordinance to determine whether the licensing provisions are constitutional under any circumstances and as against any potential plaintiff.

2. Facial Challenge

■ When a plaintiff raises a facial challenge to a regulation imposing a prior restraint on First Amendment rights, it is not enough to determine whether the application of that statute violated the plaintiff's rights. Rather, the Court must look beyond the potential effect on the petitioner and determine whether the regulation impermissibly affects the free expression of other citizens. See, e.g., Broadrick v. Oklahoma, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); Munson, 467 U.S. at 967, 104 S.Ct. 2839. "[T]here is no reason to limit challenges to case-by-case 'as applied' challenges when the statute on its face and therefore in all its applications falls short of constitutional demands." Maryland v. Joseph H. Munson Co., Inc., 467 U.S. at 967, 104 S.Ct. 2839.

■ A prior restraint exists when an individual's right to speak is conditioned upon the prior approval of public officials. Deja Vu of Nashville v. Metropolitan Government of Nashville, 274 F.3d 377, 391 (6th Cir.2001). When a regulation inflicts a prior restraint on speech by requiring a speaker to obtain a license, register, or perform other duties as a condition precedent to their being allowed to exercise their First Amendment rights, in addition to meeting the appropriate level of scrutiny, it must contain "narrow, objective, and definite standards to guide the licensing authority." Shuttlesworth 394 U.S. at 150–151, 89 S.Ct. 935. Ordinances that leave the issuance of a permit to the discretion of a municipal officer are invalid. See, e.g., Cantwell v. Connecticut, 310 U.S. 296, 305, 60 S.Ct. 900, 84 L.Ed. 1213.

■ The licensing provisions of the Ordinance at issue create a prior restraint on the exercise of free speech. It is apparent from the face of the ordinance that there are no objective and definite standards to guide the licensing authority's discretion in granting the licenses. Although the Ordinance requires applicants to provide information related to their business, personal references, and (when not excepted) fingerprints and background checks, there is no guidance on how to evaluate this information in the decision making process.

The only clue, as vague as it may be, as to the what considerations should be taken into account in the licensing authority's decision is the requirement that the applicant provide references as to their "good moral character and integrity." This would appear to imply that good moral character and integrity are preconditions, though not necessarily sufficient qualifications, for receipt of a license. This Court has previously held that when a license is conditioned merely upon a showing of "good moral character," it grants the licensing authority an impermissible level of discretion. See *Ohio Citizen Action v. City of Seven Hills*, 35 F.Supp.2d 575 (1999). Mentor–On–The–Lake argues that the references to "good moral character" applies only to peddlers of goods and services. The Ordinance, however, makes so such distinction. Even if it did, there is nothing in the First Amendment Jurisprudence that exempts regulations affecting peddlers of goods and services from the requirement that a prior restraint on speech must provide narrow, objective, and definite standards to the licensing authority.

Nothing in this Ordinance constrains the issuing authority from denying a license on any grounds that they see fit, and nothing set forth in the Ordinance provides any minimum standards which must be met for a license to be granted. This omission allows, and in fact requires the issuing authority to exercise the very epitome of "unbridled discretion" which is prohibited by First Amendment jurisprudence. *See, e.g., City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 770, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). This Court cannot presume that discretion will be applied consistently, in good faith and in accordance with appropriate standards when no standards exist on the face of the regulation. In fact, the undisputed fact that OCA was allowed to avoid the licensing provisions for nearly fifteen years be-fore they were told they would have to obtain a license to continue their activities indicates that the discretion afforded the licensing authority in this regard is not applied consistently.

The licensing provisions are also under-inclusive and not narrowly tailored to serve the City's stated interests. Mentor–On–The–Lake asserts that it has enacted the licensing provisions of the Ordinance to prevent fraud, prevent crime and to protect the privacy of its residents. In so far as it may require fingerprinting and background checks from solicitors, allegedly in order to protect its citizens from fraudulent solicitors and to prevent strangers from being able to access houses in order to case them out as possible targets for burglary or other such crimes, the Ordinance is underinclusive. Section 850.03 exempts a series of entities from these requirements, including but not limited to: (1) any person selling a product of his or her own raising, and (2) a manufacturer selling any article manufactured by him or her. Further the entire chapter excludes the sale and delivery of newspapers, dairy products, baked goods, laundry, diaper service and dry cleaning service.

There is no indication that these services present less risk of fraud or less opportunity for someone who wishes to gain access to a home with false pretenses in order to case it out for a potential crime. Conversely, there is also no support for the conjecture that those affected by the regulation pose any higher risk of fraud or crime than the those not affected. As Justices Breyer, Souter and Ginsburg stated in their concurrence in *Stratton*, "It is also intuitively implausible to think that [the Ordinance}] serves any governmental interest in preventing such crimes. As the Court notes, several categories of potential criminals will remain entirely untouched

by the ordinance. And as to those who might be affected by it, 'we have never accepted mere conjecture as adequate to carry a First Amendment burden.'" *Stratton*, 536 U.S. at 170, 122 S.Ct. 2080, 2092 (Breyer, Souter, Ginsburg concurring).

As to the resident's privacy concerns, the posting of "No Solicitation" signs and enforcement taken against any organization or individual who disregards such signs provides ample protection for the resident's privacy. It also allows residents who are amenable to receiving information, participating in surveys and contributing to charitable causes to decide for themselves who they wish to talk to, listen to, and contribute to. Further, an un-licensed solicitor has no less effect on a resident's privacy than does a licensed solicitor.

Therefore, regardless of the level of scrutiny applied, and without need to address any other Constitutional deficiencies that may exist, the licensing provisions of the Ordinance are facially unconstitutional because they do not contain narrow, objective, and definite standards to guide the licensing authority; they are underinclusive; and they are not narrowly tailored to serve the government's interest.

Because § 850.01 is facially unconstitutional, and §§ 850.02 and 850.03 cannot stand alone, all three sections are deemed invalid. The Court need not address the validity of each application requirement, however, it should be noted that those provisions that require applicants to submit and pay for their own background check, and provide fingerprints and photographs prior to obtaining a license are constitutionally suspect and similar provisions have been deemed invalid by a variety of courts. *See, e.g., National People's Action v. Village of Wilmette*, 914 F.2d 1008 (7th Cir.1990), *cert. denied Village of Wilmette v. National People's Action*, 499 U.S. 921, 111 S.Ct. 1311, 113 L.Ed.2d 245

(1991)(fingerprinting requirement for political canvassers violated First Amendment); *Ohio Citizen Action v. City of Avon Lake*, 986 F.Supp. 454 (N.D.Ohio 1997)(requirement that applicant provide fingerprints upon request of licensing authority violates First Amendment).

### B. *Curfew Provision*

The curfew provision is severable from the licensing provisions in the Ordinance, and therefore must be analyzed separately. Mentor–On–The–Lake argues that the curfew provision raises a question of fact because a reasonable jury could find that the provision allows for reasonable alternative channels of communication. While it is true that a triable issue of fact exists regarding this element, the question of whether reasonable alternative channels of communication exist only arises if a content-neutral restriction passes intermediate scrutiny.

■■■ A time, place and manner restriction is generally viewed under intermediate scrutiny with the additional requirement that the government show that reasonable alternative channels of communication exist. However, if such a restriction is not content-neutral it is subject to strict scrutiny. The Mentor–On–The–Lake curfew is content based. It imposes different time restrictions on different categories of speech. "[A] law permitting communication in a certain manner for some but not for others raises the danger of content and viewpoint censorship...." *Plain Dealer Publishing Co.*, 486 U.S. 750, 108 S.Ct. 2138.

Under the Ordinance, an entity selling food or beverages may not go door-to-door between one half hour after sunset and 9:00 am. A "recognized" charitable, educational, civic or religious organization must cease its door-to-door solicitation of funds or donations at 8:00 p.m. or one half

hour after sunset whichever comes first. In the summer, this means that the commercial sale of food and beverages receives more latitude than the solicitation of funds and donations for charitable, social and political organizations, even though the speech attendant to donation solicitations is afforded more First Amendment protection than commercial speech. Even more striking, all other door-to-door canvassing, sales and solicitations, including pure political and religious speech not burdened by any financial solicitation is prohibited after 5:00 p.m. Thus, the most protected speech is the most restricted under this Ordinance.

Strict scrutiny requires the City to use the least restrictive means necessary to advance a compelling state interest. The City has not explicitly set forth a specific state interest addressed by the curfew. However, it has alleged that "[t]here are many areas in the City that are not well-lit and do not have sidewalks. Also, over the years, the City has received complaints from residents when persons go door to door after dark for the purpose of soliciting money or are attempting to sell products. As a general rule, citizens are annoyed with this conduct." (Molenaar Aff. ¶ 17). These concerns appear to implicate state interests in promoting safety (of the canvasser and solicitors, and possibly those citizens driving on the streets after dark), and protecting the privacy of its citizens. ▮▮▮▮ While the promotion of public safety is a compelling governmental interest, the Ordinance at issue here is both overbroad and underinclusive. In so far as some door-to-door activities are prohibited after 5:00 p.m., which is hours before nightfall during much of the year, the Ordinance is overinclusive. The lack of sidewalks and poor lighting have no more effect at 5:00 p.m. on a summer day than they do at 2:00 p.m. The same holds true for the 8:00 curfew limit during those months when the sun may not set until 9:00 p.m. or later. In addition, the curfew is not restricted to those areas which are poorly lit or which are without sidewalks, nor is it restricted to foot traffic. For these reasons, the curfew provision, as written, is overinclusive.

The provision is also underinclusive. The Ordinance specifically excludes entities who are selling or delivering newspapers, dairy products, baked goods, laundry, diaper service and dry cleaning service. If the City is so concerned with the safety of those walking or driving in the dark that it must prohibit people going door-to-door after sunset, then the prohibition should not be limited to those who are walking with the purpose of exercising their right to free speech, seeking donations, or selling and delivering only a specific type of goods. Thus, the ordinance is underinclusive for its stated purpose.

Lastly, there are other means by which the City could address these public safety concerns that would be more effective, and much less restrictive on free speech. The most obvious solution would be to improve the lighting and add sidewalks wherever the government deems their absence to be unsafe to its citizens. This would protect all of the citizens of Mentor–On–The–Lake rather than singling out those who are attempting to exercise their right to communicate through door-to-door canvassing and solicitation. The Ordinance is not the least restrictive means of addressing the City's interest and therefore, it fails under strict scrutiny.[2]

---

2. Even if this Court had found the Ordinance to be content neutral, the fact that it is both overinclusive and underinclusive would lead to the conclusion that it is not narrowly tailored to serve the governmental interest at stake. Thus, even under intermediate scrutiny, the curfew provision would be unconstitutional as written.

The second interest advanced by the City is protecting its residents from annoyance. While the government's interest in minimizing annoyance is legitimate, it is not, in and of itself, compelling enough to form the basis for a content-based restriction on free speech. Nonetheless, at some point, the government's interest in protecting the privacy of citizens in their own homes may rise beyond a mere avoidance of annoyance. If canvassers and solicitors were allowed to ring doorbells at any hour of the night, the intrusion would pass from annoyance to a substantial intrusion into the sanctity and privacy of the home. Protection from this level of intrusion is arguably a compelling state interest.

The curfew provision, however, is certainly not the least restrictive means of addressing this state interest. Under the Ordinance, different entities have different time restrictions on when they are allowed to go door-to-door. Yet the level of intrusion into a resident's privacy is the same whether the person ringing the doorbell is selling food, dropping off religious pamphlets or soliciting donations for an educational organization. In all instances, the resident has the same right to ignore the bell, ask the person to leave, or answer the door and listen to what the person has to say. The distinctions in the curfew provision have no real correlation to the interest purporting to be served.

Further, there is no question that each resident has an unqualified right to exclude solicitors from their property by posting a no solicitation sign. Some communities also allow residents to register their opposition to particular types or times of solicitation with the City. These methods are much less restrictive means of preventing unwarranted and unwanted intrusions into the privacy of their home life. A blanket ban on post-dark solicitations not only restricts the right of organizations to spread their messages, but it can also interfere with the residents right to hear and respond to such messages if they so desire.

While the City could undoubtedly place some time restriction on the door-to-door activities of solicitors and canvassers, the restriction must be content neutral, narrowly tailored to serve the government's interest, and must leave open reasonable alternatives for communication. The provision at issue in this case is not content neutral, nor is it narrowly tailored to address the concern at issue.[3] Therefore, as currently written, the curfew provision is facially invalid as an improper restriction on free speech. § 850.04 is invalid as an unconstitutional restriction on the free expression of speech.

The court will hold a hearing to determine what damages may be assessed for these constitutional violations.

### CONCLUSION

For the reasons set forth above, this Court finds that §§ 850.01—850.04 of the Mentor–On–The–Lake City Ordinance violate the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. The City's enforcement of these unconstitutional regulations has violated OCA's First Amendment right to free expression. Mentor–On–The–Lake is hereby permanently enjoined from enforcing these provisions. A hearing shall be set to determine OCA's damages. IT IS SO ORDERED.

---

**3.** If the provision were content-neutral and narrowly tailored to serve the government's interest, there would still be a question of fact as to whether there are reasonable alternative channels of communication.