# IN THE SUPREME COURT OF IOWA

No. 22–1009

Submitted September 14, 2023—Filed December 1, 2023

**STATE OF IOWA,**

    Appellee,

vs.

**ROBERT CLARK GEDDES,**

    Appellant.

---

Appeal from the Iowa District Court for Boone County, Stephen A. Owen, District Associate Judge.

The defendant appeals his convictions for trespass as a hate crime, arguing that the evidence of guilt was insufficient and that the convictions violated his constitutional rights of free speech and due process. **AFFIRMED.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., Waterman, McDonald, Oxley, and May, JJ., joined. Waterman, J., filed a concurrence, in which Christensen, C.J., joined. McDermott, J., filed a dissent.

Martha J. Lucey, State Appellate Defender, and Ashley C. Stewart (argued), Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Aaron J. Rogers (argued), Assistant Attorney General, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

In recent years, in our country, the rainbow flag has come to symbolize support for LGBTQ+ rights. Several individuals in Boone displayed that flag or a decal of it on the front of their properties. Another person entered their premises without permission and taped anonymous notes to the doors urging, "Burn that gay flag." This individual was later found out and convicted of trespass as a hate crime. *See* Iowa Code § 716.8(3) (2021). He now asserts on appeal that his conviction violated the First Amendment to the United States Constitution and article 1, section 9 of the Iowa Constitution. We disagree. The statute in question does not criminalize speech, but rather conduct with a specific intent—namely, trespassing on property because of the property owner or possessor's association with persons of a certain sexual orientation. The individuals' display of the LGBTQ+ flag or flag decal on their own properties was an exercise of First Amendment rights; the defendant's surreptitious entry onto those properties to post his harassing notes was not. For these reasons, and because we are not persuaded by the defendant's other appellate arguments that would require us to construe the hate crime statute implausibly or to overturn a soundly reasoned forty-year-old precedent, we affirm the defendant's convictions and sentence.

### II. Background Facts and Proceedings.

**A. The June 2021 Notes and Resulting Charges.** In June 2021, renters and homeowners who displayed LGBTQ+ Pride flags or decals in Boone began receiving handwritten notes taped on their front doors.

The first note, discovered on June 16 and shaped like a warning sign, said, "Warning due to high levels of flaggotry an investigation has been launched to control the spread of HIV/AIDS. We are sad to say the bare back orgy has been canceled. Burn that gay flag." The renters, who displayed an LGBTQ+ Pride flag

or decal on their premises, contacted the Boone Chief of Police about the note and filed a police report. They specifically asked for information on whether the Boone Police Department "keep[s] track of crimes against LGBTQ people within the City of Boone" and "how many incidents against LGBTQ people have been reported to the Boone Police so far in 2021 and in each of the past five years."

On June 19, four additional notes were located, omitting the opening words and stating simply, "Burn that gay flag." The notes had the same handwriting. The recipients reported that they found the notes to be "alarming, annoying, and/or threatening."

Video surveillance footage at some of the homes revealed a man approaching with a piece of paper in his hand and leaving a short time later. Based on the surveillance, Robert Geddes was identified as the individual. Geddes did not have prior permission to enter any of the five properties.

Geddes was initially charged by trial information with five counts of trespass as a hate crime, a serious misdemeanor, in violation of Iowa Code sections 716.7 and 716.8(3), and by complaint with five counts of harassment in the third degree, a simple misdemeanor, in violation of Iowa Code section 708.7(4).

**B. Trial on the Minutes and Conviction.** Geddes moved to dismiss the charges on free-speech grounds, alleging violations of the First Amendment to the United States Constitution and article I, section 7 of the Iowa Constitution. The State resisted, and the district court denied the motion, reasoning as to the trespass-as-a-hate-crime charge:

> The statutes in question criminalize actions, specifically unlawful "entering[,]" which is enhanced due to a status of an owner or possessor's membership or association in a class of protection, the statutes do not criminalize thoughts or words.
>
> . . . .

> It is the defendant's entering (or trespassing) that is criminalized to the level of a hate crime because of the statutorily protected status . . . or association of the owner or possessor of the property onto which the defendant trespassed. Again, his words may be relevant facts upon which the state may rely to prove his intent, but the thoughts from which they spring in defendant's mind are not elements of the offenses under the statutes charged herein. Free speech protects the marketplace of ideas from government intrusion. Defendant's ideas (however society chooses to judge them) are not infringed or criminalized by the statutes charged.

Thereafter, Geddes waived his right to a jury trial and agreed to a trial on the minutes; in return, the State dropped the simple misdemeanor harassment charges and agreed to recommend probation. The court found Geddes guilty on all counts. Geddes was sentenced to five consecutive one-year terms with credit for time served; the jail sentence was suspended and Geddes was placed on probation for a term not to exceed two years and fined the minimum amount. Geddes appealed, and we retained the appeal.

Geddes raises three points on appeal. First, he argues that there was insufficient evidence to support his conviction. In this regard, he contends that Iowa Code sections 716.7(2)(*a*), 716.8(3), and 729A.2(4) require a defendant to intend to commit a separate hate crime in addition to the underlying trespass. Also, Geddes maintains that the State failed to prove that he targeted persons of or associated with a certain sexual orientation. In addition to challenging the sufficiency of the evidence, Geddes argues that his prosecution violated his free speech rights under the First Amendment to the United States Constitution and article 1, section 7 of the Iowa Constitution. Finally, Geddes insists that Iowa Code section 716.7(2)(*a*)(1) is unconstitutionally vague and overbroad in violation of the Fourteenth Amendment to the United States Constitution and article 1, section 9 of the Iowa Constitution.

**III. Standard of Review.**

"We review the sufficiency of the evidence for correction of errors at law." *State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018). "Pursuant to this review, 'we examine whether, taken in the light most favorable to the State, the finding of guilt is supported by substantial evidence in the record.'" *Id.* (quoting *State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011)).

We review constitutional challenges de novo. *State v. Aschbrenner*, 926 N.W.2d 240, 245–46 (Iowa 2019).

**IV. Legal Analysis.**

**A. Was the Evidence Sufficient to Find Geddes Guilty of Trespass as a Hate Crime?** Geddes argues that the evidence was insufficient to find him guilty of trespass as a hate crime. Three statutes—Iowa Code sections 716.7(2)(*a*), 716.8(3), and 729A.2(4)—are relevant.

Iowa Code section 716.7(2)(*a*) sets forth the general definition of trespass. It defines *trespass* to mean one or more of a series of acts. Iowa Code § 716.7(2)(*a*). One of those acts is: "Entering upon or in property without the express permission of the owner, lessee, or person in lawful possession with the intent to commit a public offense, to use, remove therefrom, alter, damage, harass, or place thereon or therein anything animate or inanimate . . . ." *Id.* § 716.7(2)(*a*)(1). Another of those acts is: "Being upon or in property and . . . placing thereon or therein anything animate or inanimate, without the implied or actual permission of the owner, lessee, or person in lawful possession." *Id.* § 716.7(2)(*a*)(4).[1]

Section 716.8(3) is part of the hate crime law. It says that "[a] person who knowingly trespasses on the property of another with the intent to commit a hate

---

[1] The trial information does not identify a specific definition that is relied upon.

crime, as defined in section 729A.2, commits a serious misdemeanor." *Id.* § 716.8(3).

And Iowa Code section 729A.2(4) is another part of the hate crime law. It defines a hate crime as follows:

> "Hate crime" means one of the following public offenses when committed against a person or a person's property because of the person's race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, or disability, or the person's association with a person of a certain race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, or disability:
>
> 1. Assault in violation of individual rights under section 708.2C.
>
> 2. Violations of individual rights under section 712.9.
>
> 3. Criminal mischief in violation of individual rights under section 716.6A.
>
> 4. Trespass in violation of individual rights under section 716.8, subsections 3 and 4.

*Id.* § 729A.2.

1. *Does hate crime trespass require that the defendant have the intent to commit a second trespass?* Geddes's initial argument is that the evidence to convict him was insufficient because the law quoted above requires a defendant to commit trespass and also to intend to commit a distinct hate crime (not the predicate trespass) in order to be found guilty.

The State urges that Geddes did not preserve error on this issue. However, under Iowa law, a defendant need not file a motion for judgment of acquittal to preserve error on a challenge to the sufficiency of the evidence during a bench trial. *State v. Crawford*, 972 N.W.2d 189, 197–98 (Iowa 2022).

Geddes focuses on the text of section 716.8(3), which speaks in terms of trespassing "with the intent to commit a hate crime." Iowa Code § 716.8(3). According to Geddes, this means the defendant (1) must trespass and (2) must

do so with intent to commit a separate hate crime, in order to be found guilty. Geddes concedes that he committed a simple trespass when he posted the notes on the front doors but argues that he did not intend to commit an additional, distinct crime.

Notably, section 716.8(3) is worded differently from its three other hate crime counterparts elsewhere in the criminal code. Section 708.2C, the assault alternative, refers to "an assault . . . *which is a hate crime* as defined in section 729A.2." *Id.* § 708.2C(1) (emphasis added). Section 712.9, the arson alternative, refers to an arson "*which is also a hate crime* as defined in section 729A.2." *Id.* § 712.9 (emphasis added). Section 716.6A, the criminal mischief alternative, refers to criminal mischief "*which is also a hate crime* as defined in section 729A.2." *Id.* § 716.6A (emphasis added).

Based on the foregoing texts, three possible constructions of section 716.8(3) come to mind. One is that it only criminalizes trespass with the intent to commit one of the *other* three hate crimes, i.e., assault, arson, or criminal mischief. This could account for the different wording in sections 708.2C, 712.9, and 716.6A as contrasted with section 716.8(3). Yet the problem with this construction is that it runs into the contrary wording of section 716.8(3). Section 716.8(3) makes it a serious misdemeanor to commit trespass "with the intent to commit a hate crime, *as defined in section 729A.2*." (Emphasis added.) Thus, section 716.8(3) criminalizes trespass with the intent to commit *any* of the four alternatives listed in section 729A.2, not just three of them.

To avoid this problem, Geddes urges us to adopt a variant of the first construction described above. In his view, section 716.8(3) also criminalizes trespass with the intent to commit a *second* trespass. This reading would account for all four hate crime alternatives described by the statute, but it would also lead to an irreconcilable paradox. For his reading to work, the second

trespass that Geddes describes would need to be a hate crime. *See id.* § 716.8(3) (referring to a "trespass[] on the property of another with the intent to commit a hate crime, as defined in section 729A.2"). However, under Geddes's construction, that second trespass could only constitute a hate crime if it were done by a defendant intent on committing another separate trespass, i.e., a third trespass. Naturally the third trespass could only be a hate crime if the defendant intended to commit a fourth and so on, *ad infinitum.* The State calls this an "infinite loop." Geddes's reading makes no sense.

It is most logical in our view to adopt neither of these constructions. Instead, we agree with the State that section 716.8(3) criminalizes any prohibited trespass committed because of the trespassee's protected status or their association with someone of protected status. In other words, the intended hate crime under section 716.8(3) can be the underlying trespass itself. This reading isn't foreclosed by the actual text of section 716.8(3). Moreover, it avoids the infinite loop while giving full effect to the statutory language "a hate crime, as defined in section 729A.2." *Id.*

When interpreting a statute, we begin with the plain meaning. *State v. Nall*, 894 N.W.2d 514, 518 (Iowa 2017). "If the statute is unambiguous, we will apply it as written." *Id.* A statute is ambiguous "if reasonable minds can disagree on the meaning of particular words or the statute as a whole." *State v. McIver*, 858 N.W.2d 699, 703 (Iowa 2015). In cases of ambiguity, we resort to our rules of construction. *See State v. McCullah*, 787 N.W.2d 90, 94 (Iowa 2010). This means that we steer away from odd results if possible. *See* Iowa Code §§ 4.4(3) (setting forth the "presum[ption] that . . . [a] just and reasonable result is intended"), .6(5) (stating that "[i]f a statute is ambiguous, the court . . . may consider . . . [t]he consequences of a particular construction"); *Sahinovic v. State*, 940 N.W.2d 357, 360 (Iowa 2020). To the extent that section 716.8(3) is

ambiguous, we conclude that it applies to any trespass committed with the intent required by the general hate crime provision, i.e., section 729A.2. We therefore reject Geddes's first insufficiency argument.

2. *Is there sufficient evidence that Geddes's victims were targeted for their "association with" LGBTQ+ persons because they displayed the LGBTQ+ Pride flag?* Geddes next argues that the State failed to establish that he trespassed "because of" the sexual orientation of the property owners or lessees, or because of their association with persons of a particular sexual orientation, as required by Iowa Code section 729A.2(4).

There is no evidence to indicate whether the recipients of Geddes's notes were themselves members of the LGBTQ+ community or whether Geddes believed they were. The issue thus boils down to whether Geddes targeted his victims because of their "association with" persons of a particular sexual orientation.

Geddes argues that there is no evidence that the property owners and lessees were involved in an actual "association" with persons of a particular sexual orientation within the LGBTQ+ community. He invites us to apply various dictionary definitions of "association." But in interpreting statutory text, it is important "not to make a fortress out of the dictionary." *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (L. Hand, J.). The issue here is not the meaning of the word "association" standing alone, but the meaning of the entire phrase "because of . . . the person's association with a person of a certain . . . sexual orientation." Iowa Code § 729A.2. This wording places the focus on whether the victim was targeted because of their association, not the degree of association.

One can have "association with" persons of a protected class without being part of a formal association. Indeed, Geddes perceived the property owners and lessees that way. He trespassed because he objected to their flags or flag decals,

and he objected to them because they were "gay" flags—to quote his terminology. In other words, Geddes connected the property owners and lessees in his own mind to people who were gay.

This case was tried on the minutes. We review a verdict from a bench trial on the minutes just as we would a jury verdict. *See State v. Myers*, 924 N.W.2d 823, 826 (Iowa 2019). "We view the evidence . . . in the light most favorable to the State," *State v. Kern*, 831 N.W.2d 149, 158 (Iowa 2013), although "[t]he evidence must raise a fair inference of guilt and do more than create speculation, suspicion, or conjecture," *id.* (alteration in original) (quoting *State v. Webb*, 648 N.W.2d 72, 76 (Iowa 2002)).[2] We believe that threshold of sufficiency is crossed here.

The factfinder—here the district court—was entitled to conclude (as the defendant himself did) that the property owners and lessees were displaying the flags or flag decals to associate themselves with persons of lesbian, gay, and other sexual orientations within the LGBTQ+ community. And while it's possible that they weren't—e.g., it's possible that each LGBTQ+ flag was displayed purely for aesthetic reasons rather than to express solidarity with the LGBTQ+ community—a factfinder was certainly entitled to conclude otherwise. Here, the factfinder presumably drew on his personal experience and understanding to find that the targeted persons' display of the LGBTQ+ flag or flag emblem was an expression of their solidarity with persons of particular sexual orientations. That is hardly a startling view. *See Shurtleff v. City of Boston*, 596 U.S. 243, 250, 256 (2022) (noting that "several flag raisings have been associated with other kinds

---

[2]The dissent cites no authority for its contrary view that we should conduct a de novo review when there has been a trial on the minutes.

of groups or causes, such as Pride Week" and that "the Pride Flag [was] raised annually to commemorate Boston Pride Week").[3]

In *State v. Hennings*, we said that "[t]he legislature's use of the words 'because of' in section 729A.2 requires that the defendant's prejudice or bias be a factual cause of the act." 791 N.W.2d 828, 835 (Iowa 2010), *overruled on other grounds by State v. Hill*, 878 N.W.2d 269, 275 (Iowa 2016). We added that "to find a defendant guilty under section 729A.2, the jury must determine beyond a reasonable doubt the defendant would not have acted absent the defendant's prejudice." *Id. Hennings* emphasized that motive in a hate crime case is a quintessential fact determination. *See id.* at 837 ("Juries are capable of making determinations regarding intent and motivation . . . ."). That fact determination went against Geddes here, and we decline to disturb it.

Accordingly, we hold that the minutes contain sufficient evidence that Geddes acted because of the victims' association with persons of a certain sexual orientation, as required by Iowa Code section 729A.2(4).

**B. Does the Trespass-as-a-Hate-Crime Statute as Applied to Geddes Violate His Freedom of Speech Under the United States or the Iowa Constitution?** Geddes argues that he is being unconstitutionally punished for exercise of his free-speech rights, in violation of the First Amendment to the

---

[3]The dissent reads Iowa Code section 729A.2, which requires that the victim was targeted because of their "association with a person of a certain race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, or disability" as requiring proof that the victim was targeted for associating with a *specific identifiable person* of a protected class. We disagree. "Unless otherwise specifically provided by law the singular includes the plural . . . ." Iowa Code § 4.1(17). The dissent's unduly narrow view of Iowa's hate crimes law would leave uncovered many offenses that an ordinary person would view as a hate crime—e.g., painting a swastika on the outside wall of a home displaying an Israeli flag, burning down a community center for Afghan refugees, or ambushing and assaulting an attorney who regularly represents the NAACP.

United States Constitution and article I, section 7 of the Iowa Constitution. We begin our discussion of this issue with a review of relevant caselaw.

Over thirty years ago, in *R.A.V. v. City of St. Paul*, a cross-burning case, the United States Supreme Court sustained a First Amendment facial challenge to a St. Paul, Minnesota ordinance that provided,

> Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.

505 U.S. 377, 380, 391 (1992).

The Court held that the ordinance amounted to an unconstitutional content-based restriction on speech. *See id.* at 391. Even though the ordinance dealt with fighting words, a category of speech that can be proscribed, it established a content-based restriction—prohibiting only a *subset* of that speech based on its content. *See id.* For example, the ordinance did not apply to speech known to arouse anger, alarm, or resentment in others on the basis of political affiliation, union membership, or sexual orientation. *Id.* As the Court put it, "The government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government." *Id.* at 384. Or, to quote another illustration from the Court's opinion: "[B]urning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not." *Id.* at 385.

The Court acknowledged two exceptions under which content-based discrimination might be permissible. *See id.* at 388–90. One is where "the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable." *Id.* at 388. For example, "the Federal

Government can criminalize only those threats of violence that are directed against the President, since the reasons why threats of violence are outside the First Amendment . . . have special force when applied to the person of the President." *Id.* (citation omitted). Second, the government may legislate against certain conduct even if those conduct regulations sweep up some speech incidentally. *See id.* at 389. "Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *Id.* at 390. This explains why, for example, antidiscrimination laws do not run into constitutional difficulty even when the defendant's speech is used to prove a violation.

A year after *R.A.V.*, in *Wisconsin v. Mitchell*, the Supreme Court rejected a First Amendment challenge to a Wisconsin hate crime law. *See* 508 U.S. 476, 490 (1993). The jury found the defendant guilty of aggravated battery. *Id.* at 480. The jury further determined that the defendant had intentionally selected his victim on the basis of his race—indeed, the defendant had specifically commented on the victim's race. *Id.* As a result, the defendant received a longer sentence under Wisconsin's hate crime enhancement statute. *Id.*; *see also* Wis. Stat. § 939.645 (1989).

In turning aside the First Amendment challenge, the Court highlighted two key points. First, the underlying statute targeted conduct, not expression. *Mitchell*, 508 U.S. at 487. As the Court put it, "[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment." *Id.* at 484. Second, in the criminal law generally, conduct may be punished more severely because of the defendant's motive, which is what hate crime laws do. *Id.* at 485–87. The Court distinguished *R.A.V.* on the ground that the Wisconsin statute was aimed at "conduct unprotected by the First Amendment," not "expression." *Id.* at 487.

A year after *Mitchell*, in *State v. McKnight*, our court tracked the *Mitchell* analysis in upholding a hate crime conviction. *See* 511 N.W.2d 389, 396–97 (Iowa 1994). There, the defendant assaulted a person of color, "striking [the victim] five or six times." *Id.* at 390. Witnesses indicated that the defendant had yelled explicit racial epithets at the victim. *Id.* The defendant was convicted of infringement of individual rights. *Id.* At that time, Iowa hate crime law made it unlawful to "maliciously and intentionally intimidate[] or interfere[] with another person because of that person's race" while committing an assault or an act of criminal mischief. *Id.* at 391 (quoting Iowa Code § 729.5(3) (1991)). In sustaining the conviction, we emphasized that the defendant's actions involved nonverbal conduct that was already proscribed in our criminal laws. *Id.* at 395–96. Thus, as the Supreme Court had done in *Mitchell*, we found no First Amendment violation. *Id.* at 396.

More recently, in *Hennings*, we again upheld a hate crime conviction—this time under the current version of the law. 791 N.W.2d at 837–39. In that case, the defendant drove his truck at a group of African-American boys who had been walking in the street, running over one of them. *Id.* at 831. He had used the "n" word beforehand and continued to use that word and other racial slurs when interviewed by police the next day. *Id.* at 831–32. The defendant was convicted of assault with intent to inflict serious injury, willful injury causing bodily injury, and assault in violation of individual rights with the intent to inflict serious injury (a hate crime) under Iowa Code sections 708.2C(1), 708.2C(2), and 729A.2(1). *Id.* at 832.

On appeal, the defendant urged that the evidence was insufficient to sustain his hate crime conviction. *See id.* at 837. Specifically, the defendant insisted that the record failed to show he had run down the boy "because of" his race rather than because of his presence in the street. *Id.* at 833, 837. We

overruled the claim of error, reasoning that the defendant's motivation was a fact issue for the jury to decide. *Id.* at 837.

This case is different from *Mitchell*, *McKnight*, and *Hennings*. Geddes didn't violently assault anyone. Rather, he engaged in expressive conduct—entering properties without permission to leave notes. Although we have not encountered this kind of hate crime prosecution before, other jurisdictions have. Examples from elsewhere have involved predicate offenses of disorderly conduct, harassment, and defacement of property. *See, e.g.*, *People v. Rokicki*, 718 N.E.2d 333, 336 (Ill. App. Ct. 1999) (disorderly conduct); *People v. McDowd*, 773 N.Y.S.2d 531, 532–33 (App. Div. 2004) (harassment); *Lipp v. State*, 227 A.3d 818, 819 (Md. Ct. Spec. App. 2020) (defacement of property); *State v. Nye*, 943 P.2d 96, 98–99 (Mont. 1997) (defacement of property).

In *People v. Rokicki*, the relevant conduct involved a customer yelling antigay slurs at a restaurant server while pounding his fist on the counter. 718 N.E.2d at 335. This behavior went on for ten minutes; the customer left when his money was refunded. *Id.* The customer was subsequently charged with and found guilty of a hate crime based on a predicate offense of disorderly conduct. *Id.* at 336.

The defendant appealed, arguing that the statute under which he had been prosecuted was unconstitutional. *Id.* The Illinois hate crime statute at the time prohibited disorderly conduct when committed "by reason of the actual or perceived race, color, creed, religion, ancestry, gender, sexual orientation, physical or mental disability, or national origin of another individual or group of individuals." *Id.* (quoting 720 Ill. Comp. Stat. 5/12-7.1(a) (1994)). The Illinois Appellate Court rejected the defendant's First Amendment argument because the defendant was being punished for disruptive behavior, not distasteful speech.

*See id.* at 339. As the court put it, "[T]he first amendment does not give [the defendant] the right to harass or terrorize anyone." *Id.*

In *People v. McDowd*, the defendant threatened to burn down a house on his street if it was sold to a person of color. 773 N.Y.S.2d at 532. He also posted racist flyers, including one that said "N****** Beware." *Id.* The defendant pleaded guilty to aggravated harassment and aggravated harassment as a hate crime. *Id.*; *see also* N.Y. Penal L. § 240.30 (McKinney 2003). Later, he sought to vacate his conviction, arguing that his defense counsel had been ineffective for "fail[ing] to raise the claim that the hate crime statute . . . violated defendant's right to free speech under the First Amendment." *McDowd*, 773 N.Y.S.2d at 533. Yet the New York court refused to vacate the criminal judgment, finding that the defendant "ha[d] not established that his First Amendment claim has colorable merit" because the defendant had "engaged in the crime of aggravated harassment" and communicated in a threatening way. *Id.* at 533–34.

In *Lipp v. State*, the defendant and others scribbled graffiti on a school, nearby sidewalks, and trash cans that "included swastikas, anti-LGBTQ phrases, and other offensive writings, including 'KKK,' 'n****rs,' and 'f*** jews.' " 227 A.3d at 819. The defendant was found guilty of violating a state statute providing that one "may not deface, damage, or destroy . . . the real or personal property connected to a building . . . if there is evidence that exhibits animosity against a person or group, because of the[ir]" membership in a protected class. *Id.* (first omission in original) (quoting Md. Code Ann. Crim. Law § 10-305(2) (West 2018)). On appeal, the defendant argued that his First Amendment rights had been violated. *Id.* at 820. The Maryland Court of Special Appeals disagreed, reasoning that "the analysis of *Mitchell* is not limited to bias-motivated assaults." *Id.* at 825. Once the defendant "defac[ed] [the] property of another, his criminal activity was not protected by the First Amendment." *Id.* at 828.

Finally, in *State v. Nye*, the defendant "affixed bumper stickers [on road signs and mailboxes] that read 'NO I do not belong to CUT,' " referring to the Church Universal and Triumphant. 943 P.2d at 98. After the defendant's motion to dismiss had been denied, the defendant conditionally pleaded guilty to the hate crime of "defac[ing] any property of another" because of the person's religion. *Id.* at 99 (quoting Mont. Code Ann. § 45-5-221(1)(c) (1995)). He then appealed the prior legal ruling. *Id.* The Supreme Court of Montana upheld the trial court's refusal to dismiss the charge, reasoning that "Nye lost his First Amendment protection when he coupled the message on the bumper sticker with defacement of the property of others." *Id.* at 101.

We think this is a similar case to *Nye*. If one can be prosecuted for defacing property by posting notes that target a protected class, it seems logical that one can also be prosecuted for trespassing in order to post notes that target a protected class. The conduct may be communicative, but the statute is aimed at a broader scope of conduct, whether communicative or not. "Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V.*, 505 U.S. at 390; *see also People v. Barrigar*, 134 N.Y.S.3d 144, 149 (City Ct. 2020) (holding that the defendant could be prosecuted for criminal tampering when he removed an LGBTQ+ Pride flag from the city hall flagpole and deposited it in the city hall drop box).

Geddes complains that he received felony convictions and a harsher sentence based only on what his notes *said*. But that isn't quite true. It is Geddes's motive or intent, the fact that he trespassed "because of . . . the person's association with a person of a certain . . . sexual orientation," that led to the more serious criminal consequence. Iowa Code § 729A.2. To borrow from the Supreme Court phrasing in *Mitchell*: "[M]otive plays the same role under the

[Iowa hate crime] statute as it does under [Iowa] antidiscrimination laws . . . ." 508 U.S. at 487. Our criminal law provides many examples where conduct is punished more harshly depending on the defendant's motive—possession of a controlled substance with intent to distribute, going armed with intent, etc. *See* Iowa Code § 124.401(1); *id.* § 708.8.

Geddes also argues that "Burn that gay flag" does not amount to "fighting words" whose utterance the government can punish. In that regard, he relies on the following passage from *McKnight*:

> Had McKnight limited his attack on Rone to mere words, the First Amendment would have protected his right to do so. He lost that protection when his racial bias toward blacks drove him to couple those words with assaultive conduct toward Rone, who is black. In these circumstances, the words and the assault are inextricably intertwined for First Amendment purposes.

511 N.W.2d at 395. But the issue here is not whether Geddes could have posted a note saying "Burn that gay flag" on his own property or even displayed it on public property. Geddes entered the property of others without permission to place an object thereon without their permission. *See* Iowa Code § 716.7(2)(*a*)(1), (4). What Geddes did was not protected conduct.

For these reasons, we hold that Iowa Code sections 716.7(2)(*a*), 716.8(3), and 729A.2(4), as applied to Geddes in this case, do not violate the First Amendment to the United States Constitution or article 1, section 7 of the Iowa Constitution.[4]

**C. Is Iowa Code Section 716.7(2)(*a*)(1) Unconstitutionally Vague or Overbroad Under the United States or the Iowa Constitution?** Geddes argues

---

[4]Geddes does not argue that article I, section 7 provides greater protection in this area than the First Amendment. Section 7 contains an "abuse" clause: "Every person may speak, write, and publish his sentiments on all subjects, *being responsible for the abuse of that right.*" Iowa Const. art. I, § 7 (emphasis added); *see also Bierman v. Weier*, 826 N.W.2d 436, 452–53 (Iowa 2013) (discussing the abuse clause).

that Iowa Code section 716.7(2)(*a*)(1) is void for vagueness and overbroad under the Due Process Clauses of both the United States and Iowa Constitutions.

The void-for-vagueness doctrine centers on the concept of fair notice. *State v. Baker*, 688 N.W.2d 250, 255 (Iowa 2004); *see also State v. Millsap*, 704 N.W.2d 426, 436 (Iowa 2005) ("[T]he statute gives fair warning of the prohibited conduct and [therefore] does not violate the void-for-vagueness doctrine.").

There are three components to this doctrine:

> First, a statute cannot be so vague that it does not give persons of ordinary understanding fair notice that certain conduct is prohibited. Second, due process requires that statutes provide those clothed with authority sufficient guidance to prevent the exercise of power in an arbitrary or discriminatory fashion. Third, a statute cannot sweep so broadly as to prohibit substantial amounts of constitutionally-protected activities, such as speech protected under the First Amendment.

*State v. Nail*, 743 N.W.2d 535, 539 (Iowa 2007). The third facet is also characterized as "overbreadth." *Formaro v. Polk County*, 773 N.W.2d 834, 841–42 (Iowa 2009) ("[O]verbreadth claims are derived from the Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution. Overbreadth analysis applies where a statute sweeps too broadly and substantially chills First Amendment rights." (citation omitted)).

Void-for-vagueness challenges to our criminal laws have been raised repeatedly, usually without success. For example, notwithstanding such challenges, we have upheld laws (1) prohibiting loitering by certain sex offenders, (2) requiring sex offenders to register when they change residence, (3) authorizing "a civil penalty of an amount not less than the amount of any criminal fine authorized by law for the offense" for a deferred judgment, and (4) prohibiting sexual exploitation by a counselor or therapist. *State v. Coleman,*

907 N.W.2d 124, 146–47 (Iowa 2018); *State v. Showens*, 845 N.W.2d 436, 448 (Iowa 2014); *Nail*, 743 N.W.2d at 537, 544; *State v. Gonzalez*, 718 N.W.2d 304, 310 (Iowa 2006).

We have stated that "[d]ue process merely requires that a standard of conduct be reasonably ascertainable 'by reference to prior judicial decisions, similar statutes, the dictionary, or common generally accepted usage.' " *Baker*, 688 N.W.2d at 255 (quoting *State v. Sullivan*, 298 N.W.2d 267, 270 (Iowa 1980)). We have also said that the concept of "objective reasonableness" may give fair warning and constrain governmental discretion. *See Showens*, 845 N.W.2d at 445–48.

As we noted earlier, Iowa Code section 726.2(2)(*a*)(1) makes it unlawful, without express permission, to enter someone's property with the intent to place something there. Forty years ago, in *State v. Chase*, we upheld this statute against void-for-vagueness and overbreadth challenges. 335 N.W.2d 630, 633–34 (Iowa 1983). We rejected an overbreadth challenge because the statute did not "invade[] the area of protected freedoms." *Id.* at 633. We also "perceive[d] no lack of fair notice of the conduct that is prohibited." *Id.* at 634. Although the analysis in *Chase* was brief—mercifully so, some current-day readers of our opinions might say—Geddes does not ask us to overrule *Chase*.

Significantly, Geddes doesn't even tell us what language in section 726.2(2)(*a*)(1) he considers too vague. This isn't a case like *City of Chicago v. Morales*, where an ordinance prohibited certain loitering, defined as "remain[ing] in any one place with no apparent purpose." 527 U.S. 41, 47 (1999) (alteration in original). The United States Supreme Court condemned that ordinance "because its application depends on whether some purpose is 'apparent' to the officer on the scene." *Id.* at 61–63; *see also id.* at 65–66 (O'Connor, J., concurring in part and concurring in the judgment) (noting that the ordinance "lacks

sufficient minimal standards to guide law enforcement officers" and "fails to provide police with any standard by which they can judge whether an individual has an '*apparent* purpose' "). It is noteworthy that in *State v. Showens*, we discussed and distinguished *Morales* in upholding a loitering statute that prohibited a sex offender from:

> remaining in a place or circulating around a place under circumstances that would warrant a reasonable person to believe that the purpose or effect of the behavior is to enable a sex offender to become familiar with a location where a potential victim may be found, or to satisfy an unlawful sexual desire, or to locate, lure, or harass a potential victim.

845 N.W.2d at 440, 442–48 (quoting Iowa Code § 692A.101(17) (2011)).

Geddes does argue that "[i]n American society, it is often assumed by its citizens that a person has implied permission to approach a residential home to leave an object, often a piece of paper, such as a note or a flyer, on [the front] door or main entrance of a home." He gives the examples of a Girl Scout leaving an advertisement for a cookie sale or a neighbor leaving a notice of an upcoming garage sale. *See Florida v. Jardines*, 569 U.S. 1, 8 (2013) (discussing the implied license of a visitor to approach the front door of a home and knock).

We think Geddes carries this argument too far. For one thing, the relevant question for vagueness and overbreadth purposes is not whether *others* engage in the prohibited conduct without being prosecuted, but whether the statute provides fair notice or intrudes substantially on protected freedoms. *Nail*, 743 N.W.2d at 539. The statute indicates that trespass consists of entering private property without express permission in order to place something thereon. Iowa Code § 716.7(2)(*a*)(1). This is not the same as mere door-knocking or soliciting.

Moreover, as we noted earlier, there is an alternative definition of trespass that outlaws "[b]eing upon or in property and . . . placing thereon or therein

anything . . . without the implied or actual permission of the owner, lessee, or person in lawful possession." *Id.* § 716.7(2)(*a*)(4). The State suggests that we may want to reconcile the two subparts because subpart (1) requires "express permission," whereas subpart (4) allows an object to be left behind so long as there is "*implied or* actual permission." *Id.* § 716.7(2)(*a*)(1), (4) (emphasis added).

We don't think reconciliation is required here. Geddes didn't have *either* form of permission. He didn't leave an invitation at the doorstep for the resident to engage in a transaction, such as voting for a candidate, purchasing goods, or attending an event. Rather, he taped a scurrilous note to each front door. A reasonable person would not believe that someone else's front door is their own bulletin board. Thus, whether we treat Geddes's argument as a backdoor effort to get us to overrule *Chase* or simply another argument for why he should have been acquitted, it does not persuade us. *See State v. Paye*, 865 N.W.2d 1, 6 (Iowa 2015) (concluding that the front steps of a home are not a public place for purposes of Iowa's public intoxication law because people can only use those stairs "to approach [the] home for limited purposes—for example, to sell a product, to talk about important civic issues, or to borrow a cup of sugar").

Geddes also argues that section 716.7(2)(*a*)(1) "allows authorities to make arbitrary, discriminatory decisions about which inanimate objects warrant prosecution." Many laws can be discriminatorily enforced, traffic laws for example. But the void-for-vagueness doctrine focuses on whether the law "provide[s] those clothed with authority sufficient guidance." *Nail*, 743 N.W.2d at 539. For reasons discussed above and in *Chase*, we believe the trespass law provides sufficient guidance. That it may be infrequently enforced does not mean it is inherently vague.

Lastly, Geddes urges that section 716.7(2)(*a*)(1) is overbroad because it intrudes on personal freedoms and encroaches on free speech. But *Chase* said

otherwise, and Geddes offers no reason why its overbreadth analysis should be reconsidered. *See* 335 N.W.2d at 633–34. Our trespass law only comes into play upon entry onto someone else's property, and there is generally no constitutional freedom to express one's self on someone else's private property. *See State v. Lacey*, 465 N.W.2d 537, 539 (Iowa 1991) ("The Constitution does not protect against a private party who seeks to abridge free expression of others on private property.").

It is true that the First Amendment prevents the State from banning certain core First Amendment activities even on private property such as door-to-door canvassing and pamphleteering, *Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 168–69 (2002), and perhaps information-gathering, *see Animal Legal Def. Fund v. Reynolds*, 630 F. Supp. 3d 1105, 1121 (S.D. Iowa 2022) (appeal pending). *See also City of Osceola v. Blair*, 2 N.W.2d 83, 83 (Iowa 1942) (finding that an ordinance prohibiting solicitation violated article I, section 9 of the Iowa Constitution).

But the trespass law, unlike the St. Paul ordinance in *R.A.V.*, is not a targeted restriction on First Amendment activity. As relevant here, it is a general ban against leaving objects on private property without permission, whether the object happens to be a posted handwritten note or a load of waste that the defendant prefers not to take to the dump. Geddes cites no authority that such a law raises First Amendment concerns. We therefore decline to adopt Geddes's void-for-vagueness and overbreadth arguments.

## V. Conclusion.

For the reasons stated, we affirm Geddes's convictions and sentence.

**AFFIRMED**.

Christensen, C.J., Waterman, McDonald, Oxley, and May, JJ., join this opinion. Waterman, J., files a concurrence, in which Christensen, C.J., joins. McDermott, J., files a dissent.

**WATERMAN, Justice (concurring).**

I fully join the well-reasoned majority opinion in this case of first impression in Iowa but want to further explain First Amendment protection under the U.S. Constitution in trespass prosecutions. I agree that Robert Geddes lost his First Amendment protection for speech when he walked onto the properties of persons displaying Pride flags and attached his hostile notes ("Burn that gay flag.") to their front doors without their permission. Like the majority, I view this case as similar to *State v. Nye*, where the Montana Supreme Court affirmed a hate crime conviction of a defendant who affixed a disparaging bumper sticker on church property without permission. *See* 943 P.2d 96, 100–01 (Mont. 1997). The *Nye* court drew the line where we do:

> Nye fails to recognize that the difference between his conduct and that of others in the Gardiner community is that the others he refers to placed the stickers on their own property while Nye placed the stickers on other people's property without their permission. As the State asserts in its brief, if Nye had limited his attack on [the church] to the display of a bumper sticker on his car or living room window, the First Amendment would have protected his right to do so. Nye lost his First Amendment protection when he coupled the message on the bumper sticker with defacement of the property of others.

*Id.* at 101. The Iowa trespass statute is content neutral, and Geddes's offensive notes affixed to other persons' front doors—like the hostile bumper stickers attached to the church property in *Nye*—can be regarded as defacement of property committed during a trespass.[5]

---

[5]*See* Iowa Code § 716.1 ("Any damage, *defacing*, alteration, or destruction of property is criminal mischief when done intentionally by one who has no right to so act." (emphasis added)); *id.* § 729A.2(3) (including criminal mischief in hate crime enhancement). "Defacement," constituting conduct unprotected by the First Amendment, may include messages that are easily removed, such as the sticker in *Nye* or Geddes's notes taped to front doors. *See, e.g.*, *Mahoney v. Doe*, 642 F.3d 1112, 1114, 1119 (D.C. Cir. 2011) (rejecting First Amendment challenge to defacement statute brought by protestor intending to use sidewalk chalk and determining that "the defacement at issue is temporary and can be cured" but "[t]he government can proscribe

I also agree with the majority that persons flying Pride flags are "associated" with the LGBTQ+ community within the meaning of Iowa's hate crime statute; indeed, that is exactly why Geddes admittedly targeted them. Our court's reasoning likewise would allow a hate crime prosecution of a defendant who tapes a swastika or a note depicting a Hamas paraglider to the front door of a home that displays an Israeli flag.

I write separately to emphasize that the majority's fact-bound decision rejecting Geddes's constitutional claims does not preclude other as-applied First Amendment challenges to Iowa's trespass statute. Many Iowans would be surprised to learn it is a crime under the trespass statute to leave a flyer at the front door of a home without the "express permission" of the homeowner, *see* Iowa Code § 716.7(2)(*a*)(1) (2021) (defining criminal trespass to include "[e]ntering upon or in property without the express permission of the owner . . . to . . . *place thereon or therein anything animate or inanimate*" (emphasis added)), or without the owner's "implied or actual permission," *see id.* § 716.7(2)(*a*)(4). Under the plain meaning of this statute, it could be argued that political campaign volunteers canvassing a neighborhood commit a criminal trespass simply by leaving behind a pamphlet supporting their candidate when no one answers the door to give permission.

The majority opinion accurately observes that "[f]orty years ago, in *State v. Chase*, we upheld this statute against void-for-vagueness and overbreadth

---

even temporary blight"); *id.* at 1122 (Kavanaugh, J., concurring) ("No one has a First Amendment right to deface government property."); *United States v. Nieves*, No. 18-CR-835 (OTW), 2019 WL 1315940, at *1, *3 (S.D.N.Y. Mar. 22, 2019) (holding that use of "instantly removable" marker to write "Kill N-----s" on African Burial Ground National Monument constituted defacement violating vandalism law and rejecting First Amendment defense); *In re Nicholas Y.*, 102 Cal. Rptr. 2d 511, 512–13 (Ct. App. 2000) (affirming vandalism conviction for writing "RTK" (or "Right to Crime") with Sharpie marker on private business's glass window and finding that "[t]his [statutory] definition does not incorporate an element of permanence [and so] it appears that a marring of the surface is no less a defacement because it is more easily removed").

challenges." *See* 335 N.W.2d 630, 633–34 (Iowa 1983). The majority applies *Chase* to reject Geddes's overbreadth challenge. That case, however, is no insurmountable obstacle to other constitutional challenges to this trespass statute. First, as the majority pointedly observes, Geddes did not ask us to overrule *Chase*. "We do not ordinarily overrule our precedent sua sponte." *Goodwin v. Iowa Dist. Ct.*, 936 N.W.2d 634, 645 n.4 (Iowa 2019) (quoting *Est. of McFarlin v. State*, 881 N.W.2d 51, 59 (Iowa 2016)).

Second, *Chase* is easily distinguished on its facts: the defendant in that case did not leave a note or flyer at a doorway; rather, he removed property that wasn't his from an unoccupied home without the owner's permission. 335 N.W.2d at 631. In my view, if the trespass statute is enforced against common door-to-door activities such as delivering flyers for political campaigns, local church services, new restaurants, or Girl Scout cookie sales, the First Amendment may very well prevail on an as-applied challenge. Importantly, all the decisions cited by the majority that affirmed hate crime convictions involved underlying conduct constituting a separate criminal violation (assault, disorderly conduct, harassment, or property damage or defacement). Without some other criminal conduct, leaving an object at a doorway without permission ordinarily would not be actionable.

Door-to-door canvassing has long enjoyed constitutional protection. Eighty years ago, in *City of Osceola v. Blair*, we held that a municipal ordinance prohibiting door-to-door sales solicitations violated the due process clause of the Iowa Constitution because it "impose[d] an unreasonable restraint upon a lawful business." 2 N.W.2d 83, 83–84 (Iowa 1942). More recently, the United States Court of Appeals for the Tenth Circuit held that a municipal ordinance imposing a 7:00 p.m. curfew on door-to-door sales violated the First Amendment. *Aptive*

*Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 968, 986–87 (10th Cir. 2020) (holding in favor of door-to-door seller of pest control services).

The majority recognizes that Geddes "engaged in expressive conduct" by affixing his notes on front doors. In *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton,* the United States Supreme Court addressed a municipal ordinance requiring a permit from the mayor's office before canvassers could go on private property to promote any "cause." 536 U.S. 150, 154 (2002). Members of Jehovah's Witnesses sought to go door-to-door without getting a permit to proselytize and distribute religious materials. *Id.* at 153. The Court prefaced its review of precedent by noting that "[f]or over 50 years, the Court has invalidated restrictions on door-to-door canvassing and pamphleteering." *Id.* at 160 & n.10 (collecting cases). The Court reiterated that the "hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses," and it is protected under the First Amendment. *Id.* at 161–62 (quoting *Murdock v. Pennsylvania*, 319 U.S. 105, 108–09 (1943)). The Court further emphasized "the important role that door-to-door canvassing and pamphleteering has played in our constitutional tradition of free and open discussion." *Id.* at 162. The Court held that the ordinance was unconstitutional under the First Amendment, reasoning:

> The mere fact that the ordinance covers so much speech raises constitutional concerns. It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so.

*Id.* at 165–66. In my view, criminalizing the general distribution of flyers on private property could well implicate the First Amendment.

But Geddes wasn't "canvassing" a neighborhood in a manner protected by the First Amendment. He did not go to every house to proselytize, campaign, advertise an event, or sell a product or service.[6] Rather, he visited only houses with Pride flags that he associated with a protected group to leave a message attacking the owners' symbolic speech. His conduct—targeted trespassing to deface their doorways—fell outside First Amendment protection.

The Iowa trespass statute, however, will not always avoid a First Amendment defense simply based on the content-neutral requirement that a physical object be left on the property of another without permission. To the contrary, the Iowa trespass statute goes even further than the ordinance invalidated in *Watchtower Bible* by facially prohibiting Iowans from leaving *any* pamphlets on front doorsteps without the homeowner's express permission, *regardless* of whether the canvasser first obtained a permit from a government official. More should be required for criminal sanctions.

Notably, the hate crime enhancement in Iowa Code section 729A.2 is triggered when the underlying trespass is "because of the person's . . . political affiliation . . . or the person's association with [another's] political affiliation." First Amendment protections are at their zenith when a law infringes on political speech. *See Mills v. State of Alabama*, 384 U.S. 214, 218 (1966) ("[T]here is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates . . . ."). Iowa enjoys first-in-the-nation caucus status

---

[6]The Supreme Court has broadly defined "canvassing" as "to go from home to home and knock on doors or ring doorbells to communicate ideas to the occupants or to invite them to political, religious, or other kinds of public meetings." *Martin v. City of Struthers*, 319 U.S. 141, 141 (1943); *see also Edenfield v. Fane*, 507 U.S. 761, 765 (1993) (holding that door-to-door solicitation for commercial purposes is "commercial expression to which the protections of the First Amendment apply").

for presidential elections. Many Iowans already see political campaigners leaving flyers at their front doors. Isn't it reasonable to assume that most Iowans believe that activity is protected by the First Amendment?

The majority correctly concludes that Geddes's overbreadth and void-for-vagueness challenges fail because the trespass "statute provides fair notice" of what is prohibited: leaving an object on another's property without permission. But there is force to Geddes's related argument raising the specter of selective enforcement. What if local officials only prosecuted canvassers for a rival political party? What if only those leaving pro-life flyers were criminally charged with trespass and not those advocating reproductive rights, or vice versa?

The First Amendment doesn't prevent private property owners from requiring unwanted visitors to leave. *See People v. Goduto*, 174 N.E.2d 385, 390 (Ill. 1961) ("We hold that freedom of speech and press guaranteed to defendants by the first and fourteenth amendments to the Federal constitution and by section 4 of article II of [the Illinois] constitution . . . did not give them the right to remain on the [private] parking lot after they were ordered to leave.").

But the First Amendment can protect canvassers who deposit flyers at front doors without the owner's prior order to leave or a "no trespassing" or "no soliciting" sign. In *Virginia v. Hicks*, the Supreme Court rejected an overbreadth challenge to a local housing authority's trespass policy but emphasized that the defendant was *not* engaged in expressive conduct and had previously been ordered to leave and barred from returning. 539 U.S. 113, 117–18 (2003). No one apparently was prosecuted for trespass under the policy at issue without first receiving a "barment notice." *Id.* at 122–23. The *Hicks* Court concluded, "Applications of the [no-trespass policy] that violate the First Amendment can still be remedied through as-applied litigation . . . ." *Id.* at 124. I reach the same

conclusion in this case: The majority opinion leaves the door open to other as-applied First Amendment challenges to Iowa Code sections 716.7(2)(*a*)(1) and (4).

In my view, Iowa's trespass statute remains vulnerable under an as-applied First Amendment challenge by canvassers engaged in expressive political or commercial speech who leave behind flyers. With the foregoing explanation, I join the majority opinion in full.

Christensen, C.J., joins this concurrence.

**McDERMOTT, Justice (dissenting).**

The Iowa Code states that a crime becomes a "hate crime" when it is committed because of either "[(1)] the person's [(i.e., the victim's)] race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, or disability, or [(2)] the [victim]'s *association with a person* of a certain race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, or disability." Iowa Code § 729A.2 (2021) (emphasis added).

The record in this case tells us almost nothing about the people on whose doors Geddes posted his notes except for one key fact: they each displayed a Pride flag or flag decal on their property. The court thus cannot find that Geddes committed a hate crime under (1) since we have no information about any of the homeowner's characteristics. We have nothing that tells us, in other words, the homeowner's race, religion, sexual orientation, or any other characteristic to show that the crime was committed because of the homeowner's *own* characteristics. As the majority correctly concludes, "There is no evidence to indicate whether the recipients of Geddes's notes were themselves members of the LGBTQ+ community or whether Geddes believed they were."

So we turn to whether Geddes committed a hate crime under the alternative presented in (2). For this, the State must prove that Geddes left the note because of the homeowner's "*association with a person* of a certain race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, or disability." *Id.* (emphasis added). So we must ask: Who is the other "person" (or other "persons" since we assume singular nouns can be plural, *see id.* § 4.1(17)) that the homeowner is associated with?

The record doesn't provide an answer. We have no information about any homeowner's actual connection to a person having any of the characteristics

mentioned in the statute or about Geddes's beliefs on this subject. Without being able to identify the homeowner's association with a person of a certain protected characteristic, then under the plain terms of the hate crime statute, we lack evidence to uphold Geddes's hate crime convictions. This failure is fatal to the State's hate crime charge and requires reversal.

The majority attempts to bridge this chasm in the evidence by declaring that displaying a Pride flag shows "association with" "persons of lesbian, gay, and other sexual orientations within the LGBTQ+ community." But how does displaying a flag connect its displayer to an actual *person*? A flag is a symbol. *See Flag, Black's Law Dictionary* 782 (11th ed. 2019). *See generally United States v. Eichman,* 496 U.S. 310, 315–17 (1990) (describing a law criminalizing the burning of an American flag as an attempt "to preserve the flag's status as a symbol of our Nation and certain national ideals"). As a symbol, a flag doesn't independently create or express actual association with particular persons. One can own and display a Pride flag without having any association with another person.

Examples abound exposing the illogic in finding "association with" other people based merely on the display of a symbol. Assume that I were to wear a Los Angeles Angels baseball cap. Does donning the Angels logo now make me "associated with" Mike Trout and Shohei Ohtani and the other players on the Angels' roster? Am I also now "associated with" Angels fans in California or Japan or elsewhere—all of them complete strangers to me—because of the symbol on my cap? Of course not, despite whatever wish I might harbor to be associated with big-league sluggers.

Or assume I place a bumper sticker on my car depicting the blue and yellow Ukrainian flag. Am I now "associated with" Ukraine's forty million citizens? Am I "associated with" President Zelenskyy? And then of course there's

the potential inverse: whatever creates association (under this mistaken view) presumably works in the opposite direction and creates *dissociation*. So by displaying a Ukrainian flag, am I now dissociated with Russia in light of the ongoing war? Am I now dissociated with American politicians who disfavor providing support to Ukraine in the war?

You get the picture. Not everyone who displays a pirate flag is associated with actual pirates. Taking someone's display of a flag and, from that act alone, making assumptions about the displayer's association with other humans can quickly become a fool's errand. This sort of dot-connecting is rooted in speculation, not evidence, and as a result is limited only by one's imagination. It's speculation to say that everyone who displays a Pride flag is actually associated with millions of people around the world—or some unidentified subset of them—who identify as LGBTQ+.

The statute requires proof of a victim's "association with a person of a certain" protected characteristic as the basis for a hate crime. Iowa Code § 729A.2. The State bears the burden to prove every element of a crime, which in this case means that the State must offer proof of the victim's "association with a person." Merely displaying a Pride flag does not allow us to draw any conclusions about the sexual orientation or other characteristics of persons that the homeowner associates with.

Nor do Geddes's notes amount to admissions by him that the property owners and lessees were "associated with" persons of lesbian and gay orientation. Four of the five notes include only four words: "Burn that gay flag." They make no reference to any "person" with whom the homeowners are associated. The other note with the additional two sentences similarly makes no reference to any person "associated with" the homeowner. There's no admission to be found in the content of the notes Geddes left that satisfies the State's

burden of proof on this point. At best, Geddes's notes might suggest a belief that the flag indicated the homeowners' support for LGBTQ+ rights. But we cannot stretch a symbol suggesting support for a cause into evidence of a victim's actual association with *persons*. When the legislature means to refer to a general "affiliation" in our hate crime statute, it uses the word "affiliation." *See id.* (listing within the protected characteristics "political affiliation"). No such language appears with sexual orientation or sex. The statute requires a tie to a "person" having a certain protected characteristic, but evidence of it in this record is simply absent. *See id.*

The majority states that we should defer to the district court's findings because motive in a hate crime case is a factual determination and "[t]hat fact determination went against Geddes here." But this is not a case where a factfinder in a lower court heard testimony from witnesses or had access to information that we, as an appellate court, lack. This was a bench trial on the minutes, meaning that all the evidence was presented to the judge without in-court testimony and instead through a document that summarized each witness's expected testimony. *See* Iowa R. Crim. P. 2.17(2) (2023) (describing a trial on the minutes). The judge simply reviewed the documents presented by the parties and heard legal arguments from the lawyers. Since no one testified at trial, there were no credibility determinations involving witnesses that warrant our deference to the district court's findings. *See, e.g., State v. Torres*, 989 N.W.2d 121, 126 (Iowa 2023) (noting our deference to the district court's factual findings based on its opportunity to assess the credibility of witnesses). The lawyers' oral arguments are all transcribed in the record. The district court was in no better position to evaluate evidence of motive or any other issue in this case, and I thus see no reason to defer to the district court's factual findings.

The district court, for its part, found a violation of both parts of the hate crime statute: that displaying the flag was enough to prove both (1) that the homeowners *themselves* were members of the LGBTQ+ community and (2) that the homeowners were "associated with" another person having the protected characteristic. The majority acknowledges that the district court erred in its finding on the first part as no evidence in the record supports such a finding. Yet the majority defers to the district court's finding on the second part despite an identical absence of evidence of association. In explaining its position, the majority states that the judge "presumably drew on [the judge's] personal experience and understanding to find that the targeted persons' display of the LGBTQ+ flag or flag emblem was an expression of their solidarity with persons of particular sexual orientations." The majority never explains why the judge could not also presumably draw on his personal experience and understanding to make conclusions about the homeowners' own sexual orientations. Of course, both types of speculation are inadequate to prove beyond a reasonable doubt the homeowners' own characteristics or their "association with" others.

The majority's language here is telling in another way. In an effort to give meaning to the words "association with *a person of a certain*" characteristic in the statute, Iowa Code § 729A.2, the majority rewrites the statute so that "association with" is now replaced by "solidarity with." If the legislature thought that the much looser ties of "solidarity with" others was sufficient to commit a hate crime, it could have said so. It chose instead language requiring a closer link: proof of "association with" persons of a certain protected characteristic. Affirming the conviction despite the lack of evidence on this point denied the defendant his right to require the State to prove every element of the offense.

The majority criticizes this dissent's adherence to the law's text as taking an "unduly narrow view of Iowa's hate crimes law [that] would leave uncovered

many offenses that an ordinary person would view as a hate crime." But convictions in our criminal justice system are not founded on what an ordinary person would view as a crime. The legislative branch defines what is criminal in our society. *United States v. Santos,* 553 U.S. 507, 523 (2008). It does so only through the written words of statutes. *See United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 95 (1820). "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *United States v. Bass,* 404 U.S. 336, 348 (1971). Crimes, including hate crimes, are not defined by judges, and they most certainly are not defined by what judges might speculate "an ordinary person would view as a hate crime."

"The temptation to stretch the law to fit the evil is an ancient one, and it must be resisted." *Moskal v. United States*, 498 U.S. 103, 132 (1990) (Scalia, J., dissenting). The majority, in my view, succumbs to this temptation today. Because the State failed to establish the statutory elements set forth in the text of Iowa Code § 729A.2, I must respectfully dissent. I would reverse Geddes's hate crime convictions and remand to the district court for dismissal.